NATSOURCE LLC, Plaintiff,

v.

Nunzio PARIBELLO, Defendant.

No. 01 CIV. 5992(PKL).

United States District Court,
S.D. New York.

July 13, 2001.

Andrew S. O'Connor, Law Offices of Andrew S. O'Connor, New York City, for the Plaintiff.

Joel M. Cohen, Greenberg Traurig, LLP, New York City, for the Defendant.

## OPINION AND ORDER

LEISURE, District Judge.

### I.  BACKGROUND

Plaintiff, Natsource LLC ("Natsource"), brings this motion for a Preliminary Injunction prohibiting defendant, Nunzio

Paribello, from violating provisions of his employment agreement with Natsource. Natsource is in the business of brokering energy-related commodities, and Paribello has been employed by Natsource as a broker of over-the-counter energy-related commodities since November of 1999.

The employment agreement signed by Paribello and Natsource on November 8, 1999 contains the following provisions at issue here: (1) Subsection 4 allows Paribello or Natsource to terminate Paribello's employment at any time for any reason, but requires that the terminating party give at least 30 days written notice of the termination; (2) Subsection 7.1 provides that if Paribello terminates the employment, then Paribello is restricted from working for a competitor during his employment with Natsource and for three months following his termination date, but provides that Natsource will continue to pay Paribello his base salary until the three month period ends or until Paribello accepts employment with a non-competitor, whichever occurs first; (3) Subsection 7.2 provides that if Natsource terminates the employment, then Paribello is restricted from working for a competitor during his employment with Natsource and for one month following his termination date, but provides that Natsource will continue to pay Paribello his base salary until the one month period ends or until Paribello accepts employment with a non-competitor, whichever occurs first; (4) Subsection 7.4 prohibits Paribello for three months following his termination date from soliciting business from customers whom he serviced during the 180 days immediately preceding his termination date; and (5) Subsection 7.8 prohibits Paribello during his employment with Natsource and for 12 months following his termination from encouraging or agreeing with any Natsource employee to leave Natsource and accept employment with a Natsource competitor.

According to Stephen Touchstone, a Natsource manager, on June 27, 2001, Touchstone learned that Paribello intended to resign and accept a position with GFI, a Natsource competitor. When Touchstone confronted Paribello the next day, Thursday, June 28, 2001, Paribello confirmed the information and resigned from Natsource effective that day. According to Touchstone, Paribello also informed Touchstone that he intended to start work at GFI on Monday, July 2, 2001, and that he would be bringing another Natsource employee, Nick Ippolito, with him to GFI. Paribello, on the other hand, claims that he had no specific start date at GFI and that it was Ippolito, Paribello's brother-in-law, that solicited him to work for GFI. Paribello worked until between 1:30 and 3:00 p.m. and then surrendered his office keys and credit card and left Natsource. That afternoon, Andrew S. O'Connor, Esq., Natsource's attorney, informed Mark I. Reisman, Esq., Paribello's attorney at the time, that Natsource would bring an action against Paribello the next day to enforce the employment contract.

The next day, Friday, June 29, 2001, Paribello reported to work at Natsource. Touchstone instructed Paribello to take the day off and told him that Natsource would contact him regarding his employment status. Paribello then returned to his work area where he called several of his client traders and told them that Natsource was preventing him from working there or from going anywhere else to work. At about 9:00 a.m., Touchstone again asked Paribello to leave and take the day off, and Paribello complied. Touchstone testified that shortly after Paribello left Natsource's premises, Natsource received a telephone call from one of its largest customers served by Paribello, in which the customer told Natsource that it would no longer do business with Nat-

source because Natsource was treating Paribello harshly.

Later that day, Natsource received a letter from Paribello's attorney purporting to constitute 30-day written notice of Paribello's intention to terminate his employment agreement with Natsource, and stating that Natsource "breached its contractual and other obligations to him … [by] failing to pay him bonuses at the agreed upon rate and failing to remedy problems on the Natural Gas desk where he is employed." Letter from Mark I. Reisman, Esq., of Counsel to the law firm of Castro & Remer, P.C., Ossining, New York, dated June 28, 2001 [hereinafter, "Paribello Ltr # 1"].

That same day, Mr. O'Connor sent a letter to Paribello's attorney denying the assertion that Natsource breached any contractual agreement and alleging that Paribello "breached his employment agreement with, and fiduciary obligations owing to, Natsource … [by] wrongfully encouraging Natsource employees to leave Natsource to work for a competitor and wrongful solicitation of Natsource customers." Letter from Andrew S. O'Connor, Esq., dated June 29, 2001 [hereinafter, "Natsource Ltr"]. The letter further demanded that Paribello "immediately cease all of his activities in violation of Natsource's rights," and instructed that Paribello not physically report to Natsource's premises. *Id.*

Paribello's new attorney, Simon Miller, Esq., of Greenberg Traurig, LLP, responded by letter that afternoon stating that by directing Paribello to cease any brokering activity and leave the trading floor that morning, Natsource terminated Paribello without notice or cause, in violation of the employment agreement. *See* Letter from Simon Miller, Esq., dated June 29, 2001 [hereinafter, "Paribello Ltr # 2"].

On Monday, July 1, 2001, the Court granted Natsource a Temporary Restraining Order, restraining Paribello from violating subsections 7.1, 7.4, and 7.8 of the employment agreement. On July 2, 2001, Natsource filed a complaint against Paribello, which Natsource amended on July 11, 2001, in which Natsource seeks (1) a declaration that Natsource is not in breach of the employment agreement; (2) damages sustained as the result of Paribello's breach of the employment agreement; (3) damages sustained as the result of Paribello's breach of his fiduciary duties owed to Natsource; and (4) a permanent injunction enjoining Paribello from violating subsections 7.1, 7.4, and 7.8 of the employment agreement. *See* Amended Complaint.

Natsource now moves the Court to issue a Preliminary Injunction, enjoining Paribello from (1) becoming employed by a competitor of Natsource during the pendency of this action up to October 29, 2001; (2) soliciting business, during the pendency of the action up to October 29, 2001 from any of Natsource's customers that Paribello serviced in the 180 days immediately preceding July 29, 2001; and (3) through the pendency of this action up to July 29, 2002, from encouraging, soliciting, or agreeing with any existing employee of Natsource to leave Natsource to become employed by a competitor of Natsource. *See* Order to Show Cause.

## II. *Discussion*

█ A party seeking injunctive relief must establish: (a) irreparable harm to the movant, and (b) either (i) a likelihood of success on the merits of the underlying claim or (ii) sufficiently serious questions going to the merits of the claim as to make it a fair ground for litigation and a balance of the hardships tipping decidedly toward the movant. *See Sweeney v. Bane,* 996 F.2d 1384, 1387 (2d Cir.1993); *see also*

*Inverness v. Whitehall,* 819 F.2d 48, 50 (2d Cir.1987).

## A. *Irreparable Harm*

■■■ Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell; Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (2d Cir.1983). To prevail, the movant must establish not a mere possibility that it will be irreparably harmed, but "that it is *likely* to suffer irreparable harm if equitable relief is denied." *Delphine Software v. Elec. Arts,* 1999 WL 627413 at *2 (S.D.N.Y.) (citing *Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 79 (2d Cir.1990)). Irreparable harm is "injury for which a monetary award cannot be adequate compensation." *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)).

The Second Circuit has held that it is generally not possible to calculate monetary damages if an employee violates a non-compete clause because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir.1999). "If the unique services of [an] employee are available to a competitor, the employer obviously suffers irreparable harm." *Ticor Tit. Ins. Co. v. Cohen,* 173 F.3d 63, 70 (2d Cir.1999).[1]

■■■ If Paribello is allowed to work for a competitor of Natsource or solicit Natsource customers within the 120–day period, Natsource will be irreparably harmed.

The customers have developed a strong relationship with Paribello over the year and ten months that he spent at Natsource. If Paribello is allowed to immediately work for a competitor, or otherwise solicit these customers, these customers are likely to follow him because of their unique relationship. Natsource, therefore, bargained for a contract provision allowing it a 120–day period after Paribello's termination to gain the customers' trust in other Natsource employees before those customers have the option of following Paribello to a competitor. According to Touchstone, it takes three to six months for brokers to develop strong relationships with traders. Natsource would be irreparably harmed if it did not receive the benefit of its bargain and its customers left Natsource to follow Paribello within the initial 120 days following Paribello's termination.

Natsource would also be irreparably harmed if Paribello were allowed to encourage other Natsource employees to leave Natsource to work for Natsource competitors within the next year. Natsource expends substantial resources to help its brokers develop customer relations, and the brokers are introduced to established customers. The brokers are encouraged to strengthen these relationships and Natsource supports the brokers by providing market intelligence and through relationships maintained on their desks. The loss of training and interference with already established relationships that would occur should Paribello recruit other employees within the year are unquantifiable assets.

## B. *Likelihood of Success on the Merits*

■■■ Natsource will likely succeed on the merits and obtain an injunction against

---

**1.** In fact, Judge Martin, in his opinion in *Ticor,* has recognized that cases addressing covenants not to compete "subsume the more general issue normally present in an injunc-

tion case: a showing of irreparable injury to the plaintiff." *Ticor Title Ins. Co. v. Cohen,* 1998 WL 355420 (S.D.N.Y.).

Paribello to enforce the covenants against competition written into Paribello's contract. New York courts and federal courts interpreting New York law have held that a restrictive covenant will only be enforced if it is reasonable in both time and geographic area. *See Ticor Title Ins. Co. v. Cohen*, 1998 WL 355420 (S.D.N.Y.1998) (citing *Reed, Roberts Assoc., Inc. v. Strauman*, 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976)), *aff'd*, 173 F.3d 63 (2nd Cir.1999); *see also Maltby v. Savage, Inc.*, 166 Misc.2d 481, 485, 633 N.Y.S.2d 926 (N.Y.Sup.1995) ("Although the courts of New York have adopted a strict approach in construing noncompetition agreements and restrictive covenants, the courts have repeatedly enjoined employees from breaching such agreements when they are reasonable in scope, duration, and ... area."). Once a covenant is deemed reasonable, it must still fall into one of two categories in order to be enforced. *See Reed*, 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590. For an employer to prevail, the covenant must be necessary to either (1) prevent an ex-employee from disclosing trade secrets or confidential information to the employer's competitors, or (2) to stop an employee with special, unique, or extraordinary skills from working for a competitor at a detriment to the initial employer. *See id.*

### 1. *Reasonableness*

■ A restrictive covenant will only be enforced if it is reasonable in time and geographic area. *See Ticor*, 173 F.3d at 69. "In this equation, courts must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Id.* As Judge Martin has noted, "the trend in New York law has been to enforce such covenants when not unduly burdensome." *Ticor*, 1998 WL 355420, at *2. The restrictive covenants at

issue, subsections 7.1, 7.4, and 7.8 are reasonable.

### a. *Time*

Subsection 7.1 prevents Paribello from obtaining employment with any direct competitor of Natsource while employed by Natsource and for a period of 90 days following his termination. Subsection 7.4 prevents Paribello from soliciting Natsource clients for a period of 90 days from the date of his termination, assuming a 30-day notice period. Subsection 7.8 prevents Paribello from attempting to persuade other Natsource employees to join a competing firm for a period of one year from the date of his termination. Paribello argues that these restrictions are unenforceable because they are "unreasonable [in] temporal and geographic scope." *See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion [hereinafter, "Def.'s Memo"] at 5. Assuming the covenants are enforced, Paribello will be out of the energy brokerage business for only 90 days, in addition to the 30-day notice period, and it is unlikely that the long-term relationships Paribello successfully cultivated before and during his time at Natsource would dissipate in this time. *See Ticor*, 1998 WL 355420, at *3 ("it defies common sense that clients [defendant] had developed over numerous years would forget him in six months."). In addition, for the period of 90 days in which Paribello is unable to work, as well as his 30-day notice period, Natsource will continue to pay his base salary. No further economic burden on Paribello is apparent, and the time restriction of the covenants are reasonable.

Regarding the covenant preventing Paribello from soliciting other Natsource employees for one year, Paribello is attempting to work for another brokerage firm, not start an entirely new one. It is unclear how a one-year ban on his solicitation

of Natsource of employees would seriously hinder his effectiveness as a broker. By the same token, to allow Paribello to solicit Natsource employees, in the same year in which he himself leaves, would greatly harm the firm. Thus, the one year restriction on Paribello's ability to solicit Natsource employees is not "overly broad" and is reasonable.

### b. *Geographic Area*

As for the geographic scope of the covenants, while Paribello correctly notes that the restrictions "would prevent [him] from working ... in the United States altogether," Def.'s Memo at 5, he fails to realize that such restrictions are necessary in a market in which "there exists only a finite number of customers for which each inter-dealer brokerage competes." *Id.* at 2. *See also* Declaration of Stephen Touchstone, dated July 2, 2001 [hereinafter, "Touchstone Dec."] at ¶ 4 ("The number of customers engaged in trading in the natural gas market is relatively small, and they are readily identifiable. Competition among brokers for the traders' business is highly competitive."). The evidence showed that the inter-dealer broker business in which Paribello is engaged is done over the phone lines and that Paribello could conduct his business from anywhere in the world where there is a telephone, but according to both sides, the customer pool is very small and spread out over the country. Therefore, a geographic restriction on the covenants would render them nullities. Because there is such a small number of potential customers and qualified brokers, Paribello's ability to immediately solicit any of them on behalf of a Natsource competitor would clearly be detrimental to Natsource. Yet, the period of time for which Paribello will be unable to conduct these activities for a competitor is very short.

The defendant cites two unpublished New York cases, both decided by the same state court judge, for the proposition that restrictive covenants that are broad in geographic scope are necessarily unreasonable. In both cases, *Tad Lundborg and Jersey Partners, Inc. d/b/a The GFI Group, Inc. v. Tullet & Tokyo Inc.,* Index No. 00600843 (N.Y.Sup.Ct. July 10, 2000), and *Euro Brokers Capital Mkts., Inc. v. Scharfenberger,* Index No. 109593/93 (N.Y. Sup.Ct. June 22, 1993), Judge Gammerman held that a 75 mile restriction in the brokerage industry is too broad a ban. However, other New York courts, as well as the Second Circuit, have enforced restrictive covenants with much broader geographic restrictions where the restrictive covenant was otherwise reasonable. *See Maltby,* 166 Misc.2d 481, 633 N.Y.S.2d 926 (enforcing six month ban on employment with a competitor within the New York Metropolitan Area, the Los Angeles greater Metropolitan Area, the greater Toronto Metropolitan area, the greater London Metropolitan Area, and Continental Europe.); *Ticor,* 173 F.3d 63 (enforcing six month ban on employment with competitor in the State of New York); *Bates Chevrolet Corp. v. Haven Chevrolet, Inc.,* 13 A.D.2d 27, 213 N.Y.S.2d 577 (First Dep't 1961) (enforcing five year ban, without geographic limitation, on soliciting former employer's clients); *Malcolm Pirnie, Inc. v. Werthman,* 280 A.D.2d 934, 720 N.Y.S.2d 863 (Fourth Dep't 2001) (enforcing client-based restrictive covenant containing no geographic limitation). The Court chooses to follow the reasoning of *Maltby* and the latter decisions rather than Judge Gammerman's decisions. The restrictive covenants here are otherwise reasonable and narrowly drawn. The restrictions are very limited in time, and the nature of the business requires that the restriction be unlimited in geographic scope. Therefore, the Court finds the geo-

graphic scope of the restrictions reasonable under the circumstances.

### c. Balance of Harms

■ In determining whether a restrictive covenant is reasonable, the Court "must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood." *Ticor*, 173 F.3d at 69. Here, Paribello will continue to receive his salary during the ninety day notice period and the three month sitting-out period. While he will not be able to deal with clients during that time period, the evidence showed, as it did in *Maltby*, that "a trader's absence from trading for [several] months does not render him unemployable within the industry or substantially impair his ability to earn a living. The relationships previously developed with customers can be renewed after that time." 166 Misc.2d at 486, 633 N.Y.S.2d 926. *See also Ticor*, 1998 WL 355420, at *3 ("it defies common sense that clients [defendant] had developed over numerous years would forget him in six months."). Therefore, the restrictive covenants will not substantially impair Paribello's ability to earn a livelihood.

In contrast, if Paribello is allowed to work for a competitor of Natsource or solicit Natsource customers within the 120–day period, Natsource will be irreparably harmed because his customers would be likely to follow him. According to Touchstone, it takes three to six months for brokers to develop strong relationships with traders. Natsource is entitled to the time period for which it contracted after Paribello's termination to gain the customers' trust in other Natsource employees before those customers have the option of following Paribello to a competitor. Natsource would also be irreparably harmed if Paribello were allowed to encourage other Natsource employees to leave Natsource to work for Natsource competitors within the next year, as the loss of training and interference with already established relationships that would occur could have a substantially harmful impact on Natsource. Natsource's need to protect its legitimate business interests substantially outweighs the virtually non-existent concern that Paribello could loose his livelihood.

### 2. Unique or Special Abilities of Employee

■ Once the reasonableness threshold has been satisfied, an employer seeking enforcement of a restrictive covenant must still show either a danger of having trade secrets or confidential information revealed, or unique or special abilities on the part of the employee that require the restriction. *See Ticor*, 1998 WL 355420, *2. *See also BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, *388, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999) (applying restrictive covenants to protect "against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary"). Natsource does not argue that any of its trade secrets or confidential information will be compromised if Paribello is employed elsewhere. Thus, the relevant inquiry is whether Paribello has any "unique or special abilities" that would harm Natsource if he is employed elsewhere.

In *Maltby*, the court enforced a restrictive covenant on the grounds of unique abilities of an employee, holding that "[brokers] have unique relationships with the customers with whom they have been dealing that developed while employed at [employer] and, partially, at [employer's] expense." 166 Misc.2d at 486, 633 N.Y.S.2d 926. *See also Ticor*, 1998 WL

355420, *2 (enforcing a restrictive covenant after noting "[employee] developed ... new relationships, and maintained his old ones, at least in part by way of a substantial entertainment expense account provided for by [plaintiff].").

■ The facts of *Maltby* mirror those in the instant case. Paribello works in a specialized field, with few potential clients. A broker's success in such a field clearly depends on his ability to cultivate a relationship with his clients. Natsource expended substantial resources to help cultivate these relationships, including resources spent on: informal training; sophisticated telecommunications and computer hardware and software, such as direct lines to customers and speaker boxes; the development of pricing models; and travel and entertainment. Touchstone testified that Natsource not only expended resources to nurture Paribello's existing relationships, but that Natsource introduced Paribello to customers with whom Natsource had already established relationships and helped Paribello further develop and strengthen those relationships. The Natsource name alone served as a resource to Paribello as he established client relationships. As Paribello admitted during testimony, Natsource had a better reputation than his previous employer, T.F.S., making it easier for him to broker trades. Paribello also admits spending close to $10,000 last year from his travel and entertainment account at Natsource to entertain customers. *See* Def.'s Memo at 17. While Paribello contends that this is not spending "lavishly," *id.* at 17, $10,000 per year can certainly be considered "substantial." Further, Natsource sub-

mitted evidence during the hearing showing that 99% of the commission Paribello earned during the first trimester of 2001 resulted from trades with customer traders with whom Paribello developed a relationship only after beginning his work for Natsource.[2] This clearly indicates that the resources provided to Paribello by Natsource facilitated his development of new customer relationships.

Paribello argues that his "skills, knowledge and client contacts are not unique and are, in fact, readily replaceable." Def.'s Memo at 18. He notes that there are two other Natsource employees who had relationships with Paribello's clients and are presumably already replacing him. *See id.* at 19. Paribello further states that "what is of paramount importance to success is not the employer's propriety or confidential information, but the broker's skill and dynamics in dealing with customers. [His] personality and skill are his alone and not the property of his employer." *Id.* at 18.

Even if Paribello is readily replaceable, this alone does not preclude his status as "unique." *See Ticor*, 173 F.3d at 71 (holding that to establish an employee's uniqueness, "it is not necessary ... that the business will grind to a halt if the employee leaves"). If Natsource is unable to find a replacement of Paribello's high ability, the firm will be at a disadvantage if it has to compete against him for clients. If there are not brokers immediately capable of performing at Paribello's high level, then his skills and talents, and the relationships they have allowed him to form with clients, may certainly be called "unique." The three month covenant against competition simply allows the bro-

---

**2.** Paribello argues that these customer relationships were not new, as he already had relationships with the entities represented by these traders. Paribello misconstrues the industry definition of "customers," as it refers not to the entities themselves, but the traders who work for them.

kers replacing Paribello the opportunity to form client ties similar to the ones Paribello had, ties Paribello strengthened using Natsource resources. As to Paribello's contention that his "personality and skill are his alone and not the property of his employer," Def.'s Mem. at 18, Natsource does not attempt to claim ownership of his skill. Rather Natsource simply recognizes that Paribello's skill is of such a level that it cannot be easily duplicated, and, if he were allowed to compete immediately against Natsource, the firm would be greatly harmed.

Paribello argued throughout the Hearing that none of the resources Natsource provided, from market prices the firm made available to its brokers to the publications e-mailed to brokers to update them generally on the natural gas market, were in any way unique, making the covenants unenforceable. However no court's interpretation of New York state law has required uniqueness on the part of the employer to make a covenant enforceable. The uniqueness requirement relates to the employee's relationships. Thus, this argument is not persuasive.

In light of these facts, the Court recognizes the special relationships between Paribello and his clients, ones cultivated, at least in part, by the resources Natsource provided, as the "unique services" provided by Paribello necessary to enforce a restrictive covenant. To allow Paribello immediately to take his services and client relationships to a direct competitor would be a great detriment to Natsource.

### 3. *Paribello's Additional Arguments that Natsource Will Not Likely Succeed on the Merits*

#### a. *Customer Origination*

Paribello argues that subsection 7.4 is unenforceable because the customers to whom he provides service were customers that he served prior to working at Natsource, and thus belong to him, and not Natsource. *See* Def.'s Memo at 6. Paribello argues that in this industry, "customer relationships ... move with the broker, and are not proprietary." *Id.* at 6–7.

Even if Paribello established all of the clients before coming to Natsource, as he contends, it is likely that access to these clients was part of Natsource's decision to hire him. Natsource was not only hiring Paribello, but his client list as well. Certainly this was the reason that Natsource offered Paribello a contract with a covenant that stated that after Paribello left, he could not solicit any customers for 90 days after his departure. As for Paribello's argument that the industry standard is for clients to follow their broker, assuming this is true, Paribello and Natsource clearly contracted around it. Subsection 7.4 is not ambiguous, and its language makes clear Natsource's intent to prevent Paribello from immediately taking his or Natsource's clients with him, regardless of prevailing market practice. Therefore, Paribello's argument is not likely to succeed on the merits.

#### b. *Paribello's Alleged Lack of Understanding*

Paribello argues that the agreement should not be enforced because he was not familiar with employment agreements, he did not understand the agreement when he signed it, and he did not have the assistance of counsel in reviewing it. He argues that he was forced to sign it because Natsource only presented the agreement to him on his second day on the job, when he had already left his prior employer. However, Paribello demonstrated on cross-examination that he did read the contract, that he had an understanding of the meaning of the restrictive covenants, and that

he had the opportunity to consult with an attorney but chose not to do so.

Paribello admitted reading the contract and negotiating certain provisions, and Natsource even changed one provision in compliance with his request. Paribello admitted that he understood subprovision 7.1 and asked that it be removed, but Mark G. Mellman, Natsource's Chief Operating Officer and signatory of the employment agreement, refused to remove the provision. Paribello also admitted that he understood subprovisions 7.4 and 7.8. Paribello stated that he took the contract home and read it.

Paribello argues that he had no experience with employment agreements and that he felt that he could not refuse to sign the employment agreement. However, he admitted on cross-examination that his prior employer had repeatedly, over a period of two months after he was employed there, asked him to sign an employment agreement, and that he had successfully refused to sign the agreement because he "did not want to tie himself down."

Paribello's signature appears on the employment contract directly below a provision that states: "Employee acknowledges by his/her signature to this contract that he or she has read this contract before signing it and has had an opportunity to have it reviewed by his/her attorney. Further, employee acknowledges that he or she fully understands the terms and provisions of this contract, which he or she expressly acknowledges to be reasonable in all respects." Paribello admits that he read this provision and understood it. He further admitted that he was aware that

he had the opportunity to consult with an attorney but chose not to do so.

Natsource is asking for nothing more than enforcement of the agreement as written. Paribello, as an experienced inter-dealer broker of energy products, demonstrated the skills necessary to negotiate the terms of his contract, and he admitted as much.[3] Therefore, defendant's argument to the contrary is likely to fail on the merits.

c. *Paribello's Breach of Contract Defenses*

Paribello argues that the employment agreement should not be enforced, because Natsource breached the agreement. *See* Def's Memo at 8–9, 12–13. Paribello argues that Natsource breached the agreement in three ways, and that Paribello is thus released from any further obligations under the contract. *See id.* Paribello is not likely to succeed on any of his arguments regarding a breach by Natsource.

First, Paribello argues that Natsource materially breached the employment agreement when it "failed to pay Paribello his bonuses using their agreed upon calculation." Def.'s Memo at 8, 12–13. Subsection 5 of the employment agreement, titled "Compensation," provides: "Employer agrees to pay, and Employee agrees to accept as the compensation for all services rendered to Employer, the compensation set forth on Exhibit A attached hereto and made a part hereof. Employee's compensation shall be subject to review and modification by the Managers of Employer at such times and in such manner as the Managers may determine in their sole discretion." Exhibit A to the employment

---

**3.** The Court had the opportunity to observe Paribello during his testimony. Although his education was limited to two and one half years of college as a Business major, the Court was impressed by his obvious intelligence and acuity, particularly when facing the crucible of cross-examination. Indeed, Paribello "developed into a successful broker and generated substantial revenues for Natsource." Touchstone Dec. at ¶ 6.

agreement provides that Paribello's first year base salary is $100,000, and that his "first year minimum guaranteed bonus [is] $30,000 . . . payable at the end of each month in the amount of $2,500, provided however, that no installment shall be due if prior to the installment due date Employee has resigned or been discharged for Cause." Paribello testified that Touchstone made a verbal representation to him when he was hired that he would receive $130,000 in base salary, plus a bonus equal to 40 percent of his revenues minus expenses and his salary. Touchstone testified that he told Paribello that he would receive at least $130,000 in total compensation and that he did not promise Paribello a 40 percent bonus payout.

Regardless of what was said in the initial negotiations, the employment agreement that Paribello signed subsequent to these initial conversations states in subsection 10: "This Agreement constitutes the full and complete understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior understandings and agreements between the parties hereto, whether oral or written, concerning the subject matter of this Agreement. Moreover, this Agreement may not be modified or amended orally." Paribello testified that he read and understood this provision prior to signing the agreement.

The agreement that now controls clearly states that Paribello would receive a first year base salary of $100,000, plus $30,000 in guaranteed bonus. Paribello could only claim that Natsource breached its bonus agreement under Exhibit A if Natsource did not pay Paribello a total of at least $30,000 in bonuses at the appropriate intervals during his first year of employment with Natsource, and Paribello has not made such a claim.

Paribello is no longer in his first year of employment, which ended in November of 2000. Therefore, by its terms, the bonus provision of Exhibit A no longer applies. However, Natsource appears to have continued to pay Paribello the $2,500 per month bonus even into Paribello's second year of employment. Regardless, subsection 5 of the employment agreement applies to Paribello's bonus structure after Paribello's first year of employment, and it provides that Paribello's compensation is subject to review and modification by Natsource at Natsource's sole discretion. Therefore, Natsource has discretion to modify Paribello's bonus structure after his first year of employment. Thus, Paribello's argument that Natsource breached the agreement by changing his bonus structure is likely to fail.

Second, Paribello argues that Natsource materially breached the employment agreement when it "failed to resolve (or attempt to resolve) poor working conditions, including eliminating unproductive, overpaid members of his Desk which materially affected Paribello's business generation efforts, the profitability of the Desk and ultimately the compensation received by Paribello." Def.'s Memo at 8, 13. Paribello did not provide any case law to support his argument that an employer has an implicit contractual obligation to eliminate unproductive and overpaid coworkers, and the Court was not surprised to find a dearth of authority on the subject. Therefore, this argument is also likely to fail.

Third, Paribello argues that Natsource materially breached the employment agreement when it "prevent[ed] Paribello from working at Natsource after he gave notice." Def.'s Memo at 13; *see also* Paribello Ltr # 2. Paribello argues that because "brokering activity" is Paribello's "required employment activity" under the

employment agreement, Natsource's insistence that Paribello leave the trading floor on June 29, 2001 "constitute[d] a termination of Mr. Paribello's employment without cause and without prior notice." Paribello Ltr # 2.

In subsection 2.1 of the employment agreement, Paribello's duties are defined as follows: "Employee shall be employed to broker over the counter energy-related and environment-related instruments, with such duties and powers as shall be reasonably determined, from time to time, by Employer." Although Paribello was hired for the purpose of providing brokering services, Natsource has the sole discretion to assign Paribello his specific duties as it reasonably determines are appropriate. Natsource reasonably determined that Paribello should spend his 30 day notice period on paid leave rather than in the office on the trading floor, given the circumstances surrounding Paribello's termination. First, Natsource had reason to believe that Paribello would solicit Natsource customers to leave Natsource and follow him to his new employer, because on June 29, 2001, Natsource received a telephone call from one of its largest customers served by Paribello, in which the customer told Natsource that it would no longer do business with Natsource because Natsource was treating Paribello harshly. According to Touchstone, this concern was reinforced when on June 29, 2001, as Paribello was asked to take the day off, Paribello angrily stated, "How do you think the customers are going to feel about this? You are playing with fire." Second, Natsource had reason to believe that Paribello would agree with other employees to leave Natsource to become employed at a Natsource competitor, because Natsource had reason to suspect that Paribello had agreed with Ippolito to leave Natsource and become employed at GFI together. Third, Natsource had reason to believe

that Paribello's presence on the desk would be disruptive to the other brokers on the desk because Touchstone testified that on Friday, June 29, 2001, when Paribello spent time at his desk, he was visibly angry and loudly complaining about his treatment by Natsource. Therefore, Natsource reasonably determined that Paribello should not deal with Natsource customers or employees during the 30–day notice period, and this constituted a reasonable change in Paribello's duties. Thus, Paribello's argument is not likely to succeed on the merits.

### d. *Paribello's Argument that Subsection 7.2 Applies*

■ Paribello argues that subsection 7.2 should apply rather than 7.1, because Natsource terminated Paribello when it instructed him to leave the trading floor, such that Paribello should only be restricted from working for a competitor for one month following his termination date. *See* Def.'s Memo at 12. Paribello is unlikely to succeed on his argument that Natsource's conduct constituted a termination of Paribello's employment, because Paribello resigned prior to Natsource's instruction to leave the trading floor, and Natsource reasonably changed his duties, given the circumstances of his resignation.

Paribello advised Natsource of his resignation on two occasions. First, Paribello resigned, effective immediately, on June 28, 2001. *See* Touchstone Dec. at ¶ 7, Def.'s Memo at 9. According to Paribello, he did not realize at the time that his contract required a 30–day notice of termination. *See id.* After realizing that night that he was required to give a 30–day notice of termination prior to resigning, Paribello reported to work the next day and had his lawyer send an official letter purporting to constitute 30–days notice of his resignation. *See* Paribello Ltr, Def.'s

Memo at 9. Between these two notices of resignation, Natsource asked Paribello to leave the trading floor and Natsource premises, and told him that he would be informed of his employment status. Because Paribello had already resigned prior to Natsource asking him to leave the trading floor, Paribello terminated the employment first. Once he terminated his employment, Natsource reasonably altered his employment duties given the circumstances surrounding his resignation. Therefore, the Court will preliminarily enjoin Paribello from violating subsection 7.1 of the agreement, which applies under the circumstances, as Paribello terminated the employment.

### III. *Conclusion*

Natsource's request for a Preliminary Injunction is GRANTED. Paribello is enjoined from violating subsection 7.1, 7.4, or 7.8 of the employment agreement dated November 8, 1999.

**SO ORDERED.**