**MEDICAL ECONOMICS COMPANY, INC. and Me Licensing Corporation Plaintiffs,**

v.

**PRESCRIBING REFERENCE, INC., Defendant.**

**No. 01 Civ. 7878(GBD).**

United States District Court, S.D. New York.

Nov. 26, 2003.

Jenifer L. Johnson, Robert L. Raskopf, White & Case, New York City, for Plaintiffs.

Chad Anderson, Craig S. Mende, Fross, Zelnick, Lehrman & Zissu, P.C., New

York City, Peter J. Stone, Foley & Lardner, Milwaukee, WI, for Defendants.

### MEMORANDUM OPINION AND ORDER

DANIELS, District Judge.

Plaintiffs Medical Economics Company and ME Licensing Corporation ("MEC") filed this action against defendant Prescribing Reference Incorporated ("PRI"). Defendant PRI filed an Answer and Counterclaim. A motion for a preliminary injunction was filed by defendant PRI. This Court indicated to the parties that Defendant PSI's motion for a preliminary injunction was denied and that a written decision would follow. For the reasons below, defendant PRI's motion for preliminary injunction was denied.

### BACKGROUND

Both plaintiffs, MEC, and defendant, PRI, are leading providers of publications and communications products and services to customers in the healthcare industry. MEC is a Florida corporation that is eminently known for its association with the "PDR" brand. Since December of 1946, MEC has used the trademark "Physicians' Desk Reference" to identify its annual main publication and two annual supplements that provide prescription drug data. In 1949, MEC began using the trademark "PDR" in addition to its "Physicians' Desk Reference" trademark to identify its annual publication. In 1971, MEC began to enclose its trademark PDR in a box, which MEC has applied to many millions of books and has used frequently and consistently in advertising and marketing materials. In 1993, MEC started publishing annual "prescribing guides" which contain information compiled from the PDR Physicians Desk Reference publication for certain specialties. Defendant PRI is a New York corporation which, in 1985, began using the title "Monthly Prescribing Reference" on its monthly publication containing information regarding ordering or recommending a specific drug in medical treatment.

In 1999, MEC began thinking of entering the market for monthly periodicals dealing with prescription drugs similar to PRI's "Monthly Prescribing Reference." Between May and June, 2001, MEC began publicly advertising its intention of entering this market with a periodical entitled "PDR Monthly Prescribing Guide." In early July 2001, PRI sent a letter to MEC requesting that MEC not use "Monthly Prescribing Guide" as a title of a publication or otherwise, claiming that physicians will be confused when they see both publications. MEC responded that it disagreed with PRI over the threat of potential confusion because MEC's "Monthly Prescribing Guide" would be designated along with its distinguished "PDR" mark which would eliminate any confusion. In addition, MEC explained that it had been annually publishing PDR Prescribing Guides for over 7 years and therefore, it would use the word "monthly" to appropriately differentiate the monthly periodical from the annual one. Because the parties could come to no agreement, and MEC was faced with threat of litigation over trademark infringement, MEC commenced action against PRI seeking declaratory judgment regarding its right to use "PDR Monthly Prescribing Guide." PRI filed counterclaims and brought a motion for a preliminary injunction against MEC from using "PDR Monthly Prescribing Guide" in alleged violation of its trademark.

### DISCUSSION

A party seeking to preliminarily enjoin trademark infringement must demonstrate (1) a likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) a likelihood of success on

the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *See, e.g., Federal Express Corp. v. Federal Espresso Inc.*, 201 F.3d 168, 173 (2d Cir. 2000). It is important to note that in the Second Circuit, "if the plaintiff does not show likelihood of success on the merits, it cannot obtain a preliminary injunction without making an independent showing of likely irreparable harm." *Id.* at 174.

 Defendant PRI claimed that it will suffer irreparable harm if MEC was not enjoined from pursuing its publication under the title, "PDR Monthly Prescribing Guide." Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Natsource LLC v. Paribello*, 151 F.Supp.2d 465, 468 (S.D.N.Y.2001) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co., Corp.*, 719 F.2d 42, 45 (2d Cir.1983)). To prevail, the movant must establish not a mere possibility that it will be irreparably harmed, but "that it is likely to suffer irreparable harm if equitable relief is denied." *Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990). "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)).

 PRI's readership is comprised of healthcare professionals. However, these doctors and physicians are not the primary revenue source for PRI. It is the advertisers that place ads in PRI's "Monthly Prescribing Reference" that comprise over 75% of the revenue generating source. PRI makes only 25% of their revenue from paying subscribers. (Hr'g Tr. 11, ¶¶ 23–25). Advertisers make the decision to place their ads in certain prescribing periodicals based upon the readership of such periodicals which is determined by an annual survey conducted by PERQ/HCI, an independent research firm. It conducts regular surveys of journal and non-journal medical publications to determine readership and use among physicians and other health care professionals. PRI claimed that demonstrated actual confusion would result, and hence irreparable harm, based upon a "mock" survey conducted by PRI's expert, Marshall Paul,[1] the president of PERQ/HCI.

This study was constructed in essentially the same manner as the regular survey: The survey was mailed to over 600 physicians, in three different groups. In Survey Group 1 and 2, PRI's publication was placed along with MEC's then non-existing publication and Triple I's publication in some particular order. Survey Group 3 received a survey showing MEC's "Monthly Prescribing Guide" non-existing publication, but not showing either PRI's publication or the Triple I's publication. In Survey Groups 1 and 2, 30 and 37 percent of the respondents, respectively, claimed use of MEC's "Monthly Prescribing Guide" despite the publication not being in existence. In Survey Group 3,

---

1. MEC has submitted a motion in limine to exclude the testimony of expert Marshall Paul based upon his alleged lack of qualifications and the irrelevancy of the survey. PRI has submitted an opposition to the motion. Although the Court has not yet made a determination whether this testimony will be excluded for trial, for the purposes of the preliminary injunction motion, the Court considered the information provided by the survey in its consideration of whether defendant PRI had met its burden to demonstrate a likelihood of confusion.

when MEC's publication was shown alone, 51 percent claimed use.

The choice of having never seen MEC's publication was not given to those surveyed. Indeed, Mr. Paul admits that while his survey shows some "confusion," it does not show what *caused* that confusion because he did not test causation. (Paul Tr. 101:10–102:3.) In addition, the Paul survey failed to use any controls, failed to confirm whether any of the respondents were physicians, and did not test how much "actual confusion" would exist after respondents had been actually exposed to hard copies of MEC's "PDR Monthly Prescribing Guide" in conjunction with PRI's "Monthly Prescribing Reference," a publication they are assumed to be familiar with. Although the results of Mr. Paul's survey shows some confusion or some likelihood of confusion, it does not show that this confusion exists *because* the respondents are confused by the titles of the publications at issue. Nor does it demonstrate that the marketed consumers, healthcare physicians, would not be sophisticated enough to differentiate the two publications once they are actually exposed to MEC's "PDR Monthly Prescribing Guide." PRI's concern is that if their consumers, physicians and doctors, confuse MEC's "PDR Monthly Prescribing Guide" for PRI's "Monthly Prescribing Reference," then "[t]hey are going to say they received or used that publication when they really didn't. If those readership numbers are artificially inflated that is going to shift advertising dollars." (Hr'g Tr. 7, ¶¶ 15–18). However, PRI offered no proof that their readership numbers will be any lower. In fact they admit, "Our numbers won't be less. We don't think our numbers will go down . . ." (Hr'g Tr. 9, ¶¶ 7–8).

There is no evidence of any measurable harm to PRI because of a shifting of advertising dollars. PRI agreed with the Court that "[t]rying to quantify the impact upon the 50 plus pharmaceutical companies who may advertise in these publications, and how they react to those numbers, and how they make a decision to put an ad in [MEC's] 'Monthly Prescribing Guide' instead of [PRI's] 'Monthly Prescribing Reference' is going to be a difficult thing to quantify." (Hr'g Tr. 10, ¶¶ 11–16). It is difficult to find anything in the record that indicated PRI will suffer such imminent irreparable harm if MEC was not preliminary enjoined from proceeding with its publication. Even if PRI shows a likelihood of confusion, a preliminary injunction cannot be granted without a showing of irreparable harm. In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied. *See JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir.1990); *Sierra Club v. Hennessy,* 695 F.2d 643, 647 (2d Cir.1982).

MEC, on the other hand, offered very tangible harms should they be enjoined from publication. Because the publication is dated, it is time-sensitive. If enjoined from its imminent publication until after trial, the cost of destroying and then reprinting the issue with a new title would exceed $125,000. (MEC's Mem. in Opp. to Prelim. Inj. 22). In addition, MEC produced approximately 800,000 marketing brochures promoting subscriptions to the "PDR Monthly Prescribing Guide." (*Id.*) If enjoined, the cost of MEC replacing these brochures would be approximately $35,000. Finally, further irreparable harm would have been caused to MEC's reputation. MEC publicly announced to advertisers and healthcare workers that it would launch "PDR Monthly Prescribing Guide" in January 2002. (*Id.*). A delay caused by an injunction during the critical pre-launch period would have caused irreparable injury to MEC's good name, reputation, PDR brand, and ongoing sales efforts that are

impossible to measure. There is no evidence in the record that PRI is likely to be irreparably harmed in a way that MEC will be irreparably harmed if enjoined.

Before looking at the likelihood of success on the merits of PRI's underlying claim, or determine whether PRI has raised serious questions going to the merits of the claim as to make it a fair ground for litigation, one must look to the balancing of the hardships to see if it tips decidedly towards the movant, PRI. *See Natsource LLC v. Paribello,* 151 F.Supp.2d 465, 468 (S.D.N.Y.2001) (accord *Sweeney v. Bane,* 996 F.2d 1384, 1387 (2d Cir. 1993)). If, after coming into the market, MEC obtains some of PRI's advertisers because survey evidence is able to show that confusion in the titles caused such readership shifting, and consequently advertising dollar shifting, PRI will be able to be compensated in damages from their measurable lost advertising revenue. Should the Court then decide that MEC must change its title or even more extreme, leave the market entirely, it is doubtful that PRI's 16 year reputation as the only preeminent monthly prescribing periodical in this industry will be significantly affected. As shown above, PRI has given no indication that advertisers are likely to switch their advertising dollars from PRI to MEC based upon any confusion of titles by doctors. On the other hand, MEC invested considerable advertising and other resources in releasing their monthly prescribing periodical. Until an ultimate resolution of this dispute or a further evidentiary showing, the balance of hardships tips in MEC's favor.

■ PRI has further not clearly demonstrated a likelihood of success on PRI's trademark infringement claim. A party claiming trademark infringement succeeds by showing both (a) a legal, exclusive right to the mark, and (b) a likelihood that customers will be confused as to the source of the infringing product. *Otokoyama Co. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir.1999).

PRI owns a federal registration for "Monthly Prescribing Reference" on the Principal Register of the U.S. Trademark Office. The term "Reference" has been disclaimed in that registration, meaning that it is less important to the mark as a whole than the remaining wording. Ownership of a federal registration creates a presumption that the mark is valid, that the named registrant is the owner of the mark, and that the registrant has the exclusive right to use the mark. 15 U.S.C. § 1057(b); *see also Church of Scientology Int'l v. Elmira Mission,* 794 F.2d 38, 42 (2d Cir.1986).

■ In the Second Circuit, eight factors are relevant to determining the likelihood of confusion: (i) the strength of [PRI's] mark; (ii) the similarity of [MEC's] and [PRI's] marks; (iii) the competitive proximity of the products; (iv) the likelihood that [the moving party] will "bridge the gap" and offer a product like [the alleged infringer's product]; (v) actual confusion between products; (vi) good faith on [MEC's] part; (vii) the quality of [MEC's] product; and (viii) the sophistication of buyers. *Federal Express Corp.,* 201 F.3d at 171 (quoting *Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir. 1961)).

■ In considering the first factor, the strength of the mark, courts look to (1) inherent strength, and (2) acquired strength. *TCPIP Holding Co. v. Haar Communications, Inc.,* 244 F.3d 88, 100 (2d Cir.2001). Inherent strength is measured by the degree of distinctiveness on a scale articulated in *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9–11 (2d Cir.1976). The scale, progressing from least to most distinctive, is described in terms of marks that are (1) generic; (2)

descriptive; (3) suggestive; and (4) arbitrary or fanciful. Judge Friendly noted that the ascending order reflected not only "eligibility to trademark status," but also "the degree of protection accorded." *Id.* at 9. PRI's "Monthly Prescribing" trademark is in the "descriptive" category.

■ Descriptive marks are marks that describe a product or its attributes. Because they are descriptions, they also lack distinctive quality as marks. The Lanham Act has accorded registerability to a descriptive mark if the public has come to associate the mark with the goods or services of the user-or "secondary meaning." *TCPIP Holding Co., Inc.,* 244 F.3d at 94. In general, descriptive marks are traditionally disfavored under the law and have been granted a minimum of protection under the Lanham Act when secondary meaning has been shown, due to equitable concerns about the unfairness of depriving the owners in mark of the goodwill they have developed and depriving the public of the ability to recognize the source of the product. *See Id.*

■ Acquired strength reflects the degree of consumer recognition the mark, "Monthly Prescribing", has achieved. Although the mark has been in continuous and exclusive use for over 16 years which gives weight to supporting a finding of acquired strength, *see Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 297 (3d Cir.1991); *see also Moore Bus. Forms, Inc. v. Ryu,* 960 F.2d 486, 490 (5th Cir.1992), and PRI has invested considerable resources in delivering its publications to a wide readership within the healthcare industry, the record is scant of proof that PRI's "Monthly Prescribing" has acquired secondary meaning. Even further, as illustrated by the court in *TCPIP Holding Co., Inc.,* 244 F.3d 88,

"[I]f a consumer knows crunchy candy bars coming from Confectioner A under the mark 'CRUNCHIES' and later encounters cookies branded 'CRUNCHY' delights," the consumer is as likely to attribute the similarity of name to two unrelated confectioners independently selecting names that describe and vaunt the crunchy texture of their products. Likewise, a person walking down Broadway who sees first "Broadway Theater," and later a "Broadway Deli" is unlikely to assume that they belong to the same owner. *See Id.* at 100.

The point of the illustration is that similarity in descriptive marks is less likely to cause confusion than similarity in arbitrary or fanciful marks such as "Kodak" or "Buick". *See Id.* The likelihood of confusion depends on consumer expectations. If similar marks would lead consumers to believe that they come from the same source, then obviously there will be confusion. However, if the similar marks lead consumers to assume that the marks were chosen because they describe similar, desirable attributes of the products, the similarity is "less likely to invite a mistaken assumption that the products must come form the same source." *See Id.*

"Monthly Prescribing" is a weak, descriptive mark, particularly when used to describe a monthly publication of drugs that are prescribed by doctors. Although PRI has achieved some degree of consumer recognition and deserves trademark protection, its strength is relatively weak and consequently, it deserves a lesser degree of protection than arbitrary, fanciful marks.

■ When assessing the second factor, the similarity of the marks, "a court should look at the general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember." *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 581 (2d Cir.1991). In addition, when analyzing the similarity of the marks, courts consider

the products' logos, typefaces, and package designs to determine whether the similarity of the marks is likely to cause confusion among potential consumers. *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir.1993) (superseded on other grounds).

PRI's mark is "Monthly Prescribing Reference". MEC's mark is "PDR Monthly Prescribing Guide." Each title contains the same two words and only differs in MEC's substitution of "Guide" for "Reference" and MEC's addition of its house mark, PDR in front of its title, "Monthly Prescribing Guide". There is conflicting authority as to whether the addition of a house mark eliminates the likelihood that consumers will be confused or may actually serve to aggravate confusion. In this case, because the PDR brand is well recognized in the healthcare industry and PRI has a strong readership of its "Monthly Prescribing Reference," there is no reason to believe MEC's use of the PDR house mark prominently in its publication will not significantly reduce the likelihood consumers will be confused as to the source of the parties' products. *See Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 46 (2d Cir.2000). Several other factors distinguish the marks in this case as well. The parties use different typefaces and logotypes. The parties color schemes also minimize confusion. *See Beech–Nut*, 346 F.Supp. at 550. PRI always uses black and rotates the additional colors of gold, copper, silver and green which are all metallic. MEC uses its red and blue color scheme associated with its annual publications already widely distributed and recognized in the healthcare industry.

■ We next turn to the competitive proximity of the products, the third factor. In analyzing this factor, courts consider the appearance and the modes of marketing the goods in determining competitive distance between products. *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1134 (2d Cir.1979) (superseded on other grounds). When products are identical or directly competitive, less similarity in the trademarks is necessary to support a finding of infringement. *See, e.g., SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980).

PRI distributes a portable size publication, issued each month, to office-based, primary care physicians and other medical professionals providing abbreviated, up-to-date information on prescription drugs and drug interactions. MEC's "Monthly Prescribing Guide" will be issued with the same frequency, provide the same type of information, and to the same consumers. PRI's and MEC's products are directly competitive. However, the Second Circuit's concern with proximity relates to "the likelihood that customers may be confused as to the Source of the products, rather than as to the products themselves." *See McGregor–Doniger*, 599 F.2d at 1134–35. Because MEC has chosen to designate their monthly prescribing periodical with their house mark, "PDR," consumers should be able to distinguish MEC's "PDR Monthly Prescribing Guide" from PRI's "Monthly Prescribing Reference."

■ The fourth factor, bridging the gap between products, is irrelevant where the products are identical or directly competitive. *See, e.g., Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998). As already discussed, MEC's new publication and PRI's publication are both quite similar and competitive. As a result, this factor has no bearing in the outcome of likelihood of confusion.

Although the fifth factor, actual confusion, "is particularly relevant to a trademark infringement action," *see Streetwise Maps, Inc.* 159 F.3d at 745, it is difficult to

establish prior to publication. The only evidence that PRI offered of actual confusion is the PERQ/HCI survey already discussed above, and determined as inconclusive on the issue of irreparable harm or a showing of actual confusion.

The next factor the Court must look at in determining likelihood of confusion is whether MEC adopted "PDR Monthly Prescribing Guide" in good faith. PRI argues that by adopting a similar name, making its publication digest-sized, by organizing its content and table of contents alphabetically by therapeutic category, and by including a table of contents on its cover, MEC acted in bad faith. MEC contends that it did these things to make its publication easy to carry in a doctor's lab coat and easy to use, not to mislead physicians into believing that they were buying PRI's "Monthly Prescribing Reference." "The intent to compete by imitating the successful features of another's product is vastly different from the intent to deceive purchasers as to the source of the product." *Streetwise Maps*, 159 F.3d at 745. MEC has been publishing numerous "Prescribing Guides" for a number of years. MEC intended to use the word "Monthly" to differentiate its annual Prescribing Guides from its new publication. (Hr'g Tr. 60, ¶ 6–13). PRI presents no evidence of bad faith on the part of MEC.

◼ The second to last factor, the quality of the infringer's goods, protects the prior user from the "risk that the public perception of his product will suffer if it is associated with a product of inferior quality." *Essence Communications, Inc. v. Singh Indus., Inc.*, 703 F.Supp. 261, 270 (S.D.N.Y.1988). Although at the time of its motion, PRI submitted that the quality of MEC's future publication was unknown, MEC previously provided nearly 170 high-quality publishing and communications goods and services. For decades it has published the well known "PDR" which it associates with its new publication. Admittedly, MEC's past reputation on its other products cannot speak for the quality of its future products, however such a reputation is some indication that MEC's PDR-branded publications will be of the same quality as its other PDR publications.

◼ The final factor in assessing the likelihood of confusion and thus, PRI's success on its merits, is the sophistication of the intended consumers. The primary consumers of these monthly prescribing periodicals are medical professionals. Doctors and physicians are "as sophisticated a group as one could imagine." *Pfizer Inc. v. Astra Pharm. Prods., Inc.*, 858 F.Supp. 1305, 1328 (S.D.N.Y.1994). Such highly sophisticated consumers are unlikely to be confused. *See Pfizer*, 858 F.Supp. at 1328.

PRI argues that physicians are less sophisticated where they received goods free of charge. However, because of the nature of the medical profession, as well as the legal consequences of being careless, doctors tend to use great care in making decisions that relate to patient care, which may involve life and death decisions. *See Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 748 (S.D.N.Y.1997). One can only assume that when physicians are making prescription decisions, they will exercise a high degree of care and will be cognizant of the publication's title, source, and reputation. Not only are physicians aware of the PDR brand from its widely-used "Physicians' Desk Reference" publication as well as its annual "Prescribing Guides," but physicians are equally aware of the only monthly prescribing periodical in existence for the last 26 years, that of PRI's "Monthly Prescribing Reference." When confronted with both these publications, there is no evidence yet provided that healthcare officials will not be able to dis-

cern between the publications and make a rational conscious choice.

After weighing the eight different *Polaroid* factors, the Court concluded that PRI has not demonstrated that MEC's use of the "PDR Monthly Prescribing Guide" title is likely to cause confusion and is thus, an infringement of PRI's trademark.

## CONCLUSION

Because PRI did not demonstrate that irreparable harm or injury will occur as a result of MEC's publication of "PDR Monthly Prescribing Guide," and the record is presently weak as to evidence of PRI's likelihood of success on its trademark infringement claim, PRI's motion for preliminary injunction against MEC is denied.

SO ORDERED.