**TICOR TITLE INSURANCE CO.;**
**Chicago Title Insurance Co.,**
**Plaintiffs–Appellees,**

**v.**

**Kenneth C. COHEN, Defendant–**
**Appellant.**

**Docket No. 98–7904.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 31, 1998.

Decided March 31, 1999.

Allen Kezsbom, New York, New York (Rana Dershowitz, Fried, Frank, Harris, Shriver & Jacobson, New York, New York; Ronald E. Richman, Morton Lorge, Molly Tatman, Schulte, Roth & Zabel LLP, New York, New York, of counsel), for Defendant–Appellant.

Steven M. Kayman, New York, New York (John Siegal, José–Manuel A. de Castro, Proskauer Rose LLP, New York, New York, of counsel), for Plaintiffs–Appellees.

Before: NEWMAN, CARDAMONE, and PARKER Circuit Judges.

CARDAMONE, Circuit Judge:

Defendant Kenneth C. Cohen (defendant or appellant) appeals from a judgment entered July 1, 1998 in the United States District Court for the Southern District of New York (Martin, J.) that issued a permanent injunction against him and in favor of plaintiffs Ticor Title Insurance Co. and Chicago Title Insurance Co. (Ticor). This panel filed a summary order affirming the judgment of the district court on November 19, 1998, and stating that this opinion would follow.

A principal question to be resolved is whether appellant's services as an employee were so unique to his employer as to provide a basis for injunctive relief. In analyzing whether an employee's services are unique, the focus today is less on the uniqueness of the individual person of the employee, testing whether such person is extraordinary in the sense, for example, of Beethoven as a composer, Einstein as a physicist, or Michelangelo as an artist, where one can fairly say that nature made them and then broke the mold. Instead, now the inquiry is more focused on the employee's relationship to the employer's business to ascertain whether his or her services and value to that operation may be said to be unique, special or extraordinary; that inquiry, because individual circumstances differ so widely, must of necessity be on a case-by-case basis.

## BACKGROUND

### Facts Relating to Employment

#### A. *The Parties*

Plaintiffs are affiliated companies that sell title insurance nationwide. Title in-

surance insures the buyer of real property, or a lender secured by real property, against defects in the legal title to the property, and guarantees that, in the event a defect in title surfaces, the insurer will reimburse the insured for losses associated with the defect, or will take steps necessary to correct it. This kind of insurance is almost always purchased when real estate is conveyed. Ticor has been, and remains today, the leading title insurance company in New York State. It focuses primarily on multi-million dollar transactions that are handled by real estate lawyers. On large transactions more than one title insurance company is often employed in order to spread the risk.

Defendant Cohen was employed by Ticor as a title insurance salesman. Title insurance salespeople contact real estate attorneys, handle title searches for them, and sell them policies; those salespeople from different title insurance companies compete to insure the same real estate transaction, seeking their business from the same group of widely-known attorneys. Due to the nature of the business, those attorneys commonly have relationships with more than one title insurance company.

Cohen began working for Ticor in 1981, shortly after graduating from college, as a sales account manager and within six years was a senior vice president in charge of several major accounts. Thus, he has been a title insurance salesman for Ticor for nearly all of his professional career. His clients have consisted almost exclusively of real estate attorneys in large New York law firms. As his supervisor testified, Cohen obtains his business due to his knowledge of the business, his professionalism, his ability to work through problems, and his ability to get things done.

### B. *Employment Contract*

Ticor and Cohen, both represented by counsel, entered into an Employment Contract on October 1, 1995. There were extensive negotiations over its terms, including the covenant not to compete, which is at issue on this appeal. The contract's stated term is until December 31, 1999, although Cohen—but not Ticor—could terminate it without cause on 30 days' notice.

The non-compete provision, enforced by the district court, stated that during his employment with Ticor and "for a period ending on the earlier of ... June 30, 2000 or ... 180 days following [his] termination of employment," Cohen would not:

> for himself, or on behalf of any other person, or in conjunction with any other person, firm, partnership, corporation or other entity, engage in the business of Title Insurance ... in the State of New York.

For the purposes of this provision, the Employment Contract provides that:

> "Title Insurance" shall be defined ... as the sale, service or rental of any product, process or service [of Ticor] ... which had been developed, sold or offered for sale by [Ticor] in the State of New York during the 365 days preceding the date of [Cohen's] termination of employment ...

It also contains the following express representation regarding the material nature of the covenant not to compete:

> [Ticor] is willing to enter into this Contract only on condition that [Cohen] accept certain post-employment restrictions with respect to subsequent reemployment set forth herein and [Cohen] is prepared to accept such condition.

Negotiation of the post-employment non-competition provision of the Employment Contract (¶ 9) culminated in a fax from Cohen's counsel to Ticor's counsel dated October 27, 1995 in which Cohen's counsel provided a proposed final version that included some additional modifications. Ticor accepted this proposed final version, and it was embodied, *verbatim,* in the final executed agreement. Thus, the non-compete provision defendant now as-

serts is unenforceable was drafted (in its final form) by his own lawyer.

Cohen enjoyed exclusive responsibility for key Ticor accounts throughout the entire term of his employment. A number of the accounts for which defendant had exclusive responsibility predated his 17–year employment, and no other Ticor sales representative was permitted to service them during the term of the Employment Contract.

In consideration for Cohen's agreeing to the recited post-employment restrictions, he was made one of the highest paid Ticor sales representatives, being guaranteed during the term of the Employment Contract annual compensation of $600,000, consisting of a base salary of $200,000 plus commissions. His total compensation in 1997 exceeded $1.1 million.

In addition to compensation, defendant received expense account reimbursements that by 1997 exceeded $150,000 per year, and which included fully paid memberships in exclusive clubs, as well as tickets to New York's professional sporting events and Broadway shows. His fringe benefits went far beyond those provided other Ticor sales representatives whose expense reimbursements are generally limited to $30,000 per year. Cohen also had his own six person staff at Ticor, all of whom reported directly to him. No other Ticor representative had such staff support.

### C. *Breach of Contract*

On April 20, 1998 TitleServ, a direct competitor of Ticor, offered to employ Cohen. As part of that offer, TitleServ agreed to indemnify Cohen by paying him a salary during the six-month period (*i.e.,* the 180 days hiatus from employment) in the event that the covenant not to compete was enforced. Defendant sent plaintiff a letter on April 21, 1998 notifying it of his resignation effective May 21, 1998 and agreed to begin working for TitleServ on May 27, 1998.

Appellant commenced employment with his new employer on that date. His employment contract there guarantees him a minimum salary of $750,000 and a signing bonus of $2 million dollars, regardless of the outcome of this litigation. Cohen has received this signing bonus and has begun receiving salary payments, as scheduled. He admits to speaking with 20 Ticor customers about TitleServ before submitting his letter of resignation, and telling each of them that he was considering leaving Ticor and joining a competitor firm. Cohen maintains that this was an effort on his part to learn more information about TitleServ, including its ability to service the New York market and the opportunity he was being offered.

During the course of this due diligence, Cohen insists he never discussed transferring any business from Ticor to TitleServ, nor did he discuss any specific deals. However, this assertion is undermined by defendant's deposition testimony concerning conversations with Martin Polevoy of the Bachner Tally law firm, in which he admits he directly solicited Polevoy's business for TitleServ and, after initial resistance from Polevoy, eventually secured a promise that Polevoy would follow him by taking his firm's insurance business to TitleServ.

### Prior Proceedings

Ticor commenced this action on June 5, 1998 and applied that day for a temporary restraining order and preliminary injunction. After receiving Cohen's opposition papers and hearing argument, the district court entered a temporary restraining order. The parties conducted expedited discovery and briefed the relevant issues over the ensuing ten days. On June 19, 1998 the district court heard further argument and extended the temporary restraining order for an additional ten days. It scheduled an evidentiary hearing, held on June 29, 1998, at the close of which the parties consented to consolidate the hearing with a

trial on the merits of Ticor's cause of action seeking a permanent injunction.

On July 1, 1998 the district court issued its opinion and order permanently enjoining Cohen from working in the title insurance business and from appropriating Ticor's corporate opportunities with its current or prospective customers for a period of six months. Applying New York law, it found this case indistinguishable from *Maltby v. Harlow Meyer Savage, Inc.,* 166 Misc.2d 481, 486, 633 N.Y.S.2d 926 (Sup.1995), *aff'd,* 223 A.D.2d 516, 637 N.Y.S.2d 110 (1st Dep't 1996).

It also relied on two other independent grounds for enjoining Cohen. First, the trial court held an injunction was justified to protect Ticor's confidential information. Second, it ruled that Cohen had breached his fiduciary duties to Ticor because Cohen had expressly asked one client to follow him to TitleServ, and he had inquired of others if they would be willing to follow him. From the grant of a permanent injunction, Cohen appeals. We affirm.

## DISCUSSION

There are five issues before us. Several require discussion, including those upon which the trial court relied in enjoining defendant. First, however, as a threshold matter, we discuss whether the injunction was properly issued; second, we analyze the district court's finding that defendant Cohen enjoyed a "special" or "unique" relationship with Ticor's clients; third, we consider a finding that defendant possessed "confidential information" of his employer's business and owed a fiduciary duty to plaintiff on that account. The fourth issue is whether under New York law, a contract not to compete violates public policy and is therefore unenforceable; and the last issue questions whether in construing the covenant—assuming its validity—it was appropriate to apply it to transactions originating in New York State concerning real property outside New York State.

## I  Injunctive Relief

### A.  *Irreparable Harm*

An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief. *See Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). An order involving injunctive relief will not be reversed unless it is contrary to some rule of equity or results from a discretion improvidently exercised. *See Meccano, Ltd. v. John Wanamaker, N.Y.,* 253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822 (1920). In other words, such an order is subject to reversal only for an abuse of discretion or for a clear error of law. *See Malarkey v. Texaco, Inc.,* 983 F.2d 1204, 1214 (2d Cir.1993); *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 581 (2d Cir.1989).

An injunction should be granted when the intervention of a court of equity is essential to protect a party's property rights against injuries that would otherwise be irremediable. *See Cavanaugh v. Looney,* 248 U.S. 453, 456, 39 S.Ct. 142, 63 L.Ed. 354 (1919). The basic requirements to obtain injunctive relief have always been a showing of irreparable injury and the inadequacy of legal remedies. *See Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989) (to obtain permanent injunction the lack of an adequate remedy at law and irreparable harm must be shown). Appellant maintains that an injunction was improvidently granted in the instant case because there was no showing that Ticor would suffer irreparable harm in the absence of its issuance.

To the contrary, we think for several reasons irreparable harm was shown to be

present in this case. Initially, it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come. In fact, the employment contract sought to be enforced concedes that in the event of Cohen's breach of the post-employment competition provision, Ticor shall be entitled to injunctive relief, because it would cause irreparable injury. Such, we think, might arguably be viewed as an admission by Cohen that plaintiff will suffer irreparable harm were he to breach the contract's non-compete provision. Further, the district court thought as a matter of law, as stated in a footnote to its written decision, that New York cases in the covenant-not-to-compete context apparently assume an irreparable injury to plaintiff. We agree with the district court that irreparable injury exists in this case.

## II  Covenant Not to Compete

### A.  *In General*

We turn to the merits. To gain some insight into the subject of non-competition contracts, we look to an early common law case in England where much of the law in this area was set forth. That case is *Mitchel v. Reynolds,* 1 P. Wms. 181, 24 Eng. Rep. 347 (Q.B.1711), which has, through the ensuing 290 years, been frequently cited and followed. There, plaintiff alleged defendant had for good consideration assigned him his bakehouse in Liquorpond Street for five years, and defendant had agreed not to engage in trade as a baker in that neighborhood for that time, and if he did he had to pay plaintiff 50 pounds. When defendant began baking again, seeking the local trade, plaintiff sued. Defendant declared that because he was a baker by trade, the bond not to engage in that trade was void as a restraint on a person's ability to earn his livelihood. Queens Bench disagreed and held that this particular restraint of trade was not void, because a "man may, upon a valuable consid-

eration, by his own consent, and for his own profit, give over his trade; and part with it to another in a particular place." *Id.* at 186, 24 Eng. Rep. at 349. The English court added that all contracts containing only a bare restraint of trade and no more must be void, but where circumstances are shown that make it a "reasonable and useful contract," the contract will be ruled good and enforced by the courts. *Id.* at 192, 24 Eng. Rep. at 351.

■■ The issue of whether a restrictive covenant not to compete is enforceable by way of an injunction depends in the first place upon whether the covenant is reasonable in time and geographic area. *See Reed, Roberts Assocs. v. Strauman,* 40 N.Y.2d 303, 307, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976). In this equation, courts must weigh the need to protect the employer's legitimate business interests against the employee's concern regarding the possible loss of livelihood, a result strongly disfavored by public policy in New York. *See id.*

A scholarly commentator described the tension between these competing concerns, which we face in the case at hand, in this fashion: An employer will sometimes believe its clientele is a form of property that belongs to it and any new business a salesperson drums up is for its benefit because this is what the salesperson was hired and paid to do. The employee believes, to the contrary, that the duty to preserve customer relationships ceases when employment ends and the employee's freedom to use contacts he or she developed may not be impaired by restraints that inhibit competition and an employee's ability to earn a living. The always present potential problem is whether a customer will come to value the salesperson more than the employer's product. When the product is not that much different from those available from competitors, such a customer is ripe to abandon the employer and follow the employee should he go to work for a competitor. *See* Harlan M. Blake, *Employee*

*Agreements Not To Compete,* 73 Harv. L.Rev. 625, 654 (1960).

That scenario fits the circumstances revealed by the present record. The way to deal with these conflicting interests is by contract, which is what the parties before us purported to do, only now appellant insists, just as was argued in *Mitchel,* that the non-compete provision is void as a contract in restraint of trade and therefore violates public policy.

■■■■ The law points in a different direction. Over a hundred years ago New York's highest court observed, in conformance with *Mitchel,* that contracts in partial restraint of trade, if reasonable, are permitted. *See Diamond Match Co. v. Roeber,* 106 N.Y. 473, 482, 13 N.E. 419 (1887). Because of strong public policy militating against the sanctioning of a person's loss of the ability to earn a livelihood, New York law subjects a non-compete covenant by an employee to "an overriding limitation of reasonableness" which hinges on the facts of each case. *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 49, 320 N.Y.S.2d 1, 268 N.E.2d 751 (1971). Assuming a covenant by an employee not to compete surmounts its first hurdle, that is, that it is reasonable in time and geographic scope, enforcement will be granted to the extent necessary (1) to prevent an employee's solicitation or disclosure of trade secrets, (2) to prevent an employee's release of confidential information regarding the employer's customers, or (3) in those cases where the employee's services to the employer are deemed special or unique. *See Purchasing Assocs. v. Weitz,* 13 N.Y.2d 267, 272–73, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963) (Fuld, J.). In the case at hand we are satisfied that the reasonableness test was met because the duration of the covenant was relatively short (six months) and the scope was not geographically overbroad. In any event, appellant does not argue that the covenant is unreasonable in time and scope. Rather, he argues that the services he provided to Ticor were not

sufficiently unique to justify injunctive relief.

### B. *Unique Services*

■■■ New York, following English law, recognizes the availability of injunctive relief where the non-compete covenant is found to be reasonable and the employee's services are unique. *See Reed, Roberts,* 40 N.Y.2d at 308, 386 N.Y.S.2d 677, 353 N.E.2d 590. Services that are not simply of value to the employer, but that may also truly be said to be special, unique or extraordinary may entitle an employer to injunctive relief. *See American Broadcasting Companies v. Wolf,* 52 N.Y.2d 394, 402, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981); *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.,* 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977); *Purchasing Assocs.,* 13 N.Y.2d at 272–74, 246 N.Y.S.2d 600, 196 N.E.2d 245. An injunction may be used to bar such person from working elsewhere. If the unique services of such employee are available to a competitor, the employer obviously suffers irreparable harm. *See American Broadcasting Companies,* 52 N.Y.2d at 402–03, 438 N.Y.S.2d 482, 420 N.E.2d 363.

Unique services have been found in various categories of employment where the services are dependent on an employee's special talents; such categories include musicians, professional athletes, actors and the like. In those kinds of cases injunctive relief has been available to prevent the breach of an employment contract where the individual performer has such ability and reputation that his or her place may not easily be filled. *See* 42 *Am.Jur.2d Injunctions* § 110 (1969). We recognized this category of uniqueness in the case of the services of an acrobat who, in his performance, with one hand lifted his co-performer, a grown man, from a full length position on the floor, an act described as "the most marvelous thing that has ever been [done] before." *Shubert Theatrical Co. v. Rath,* 271 F. 827, 829–30 (2d Cir. 1921). We later said that where services

are unique the issuance of an injunction "is not an open question in this court," and commented that this "principle is equally well settled in the courts of New York." *Associated Newspapers v. Phillips*, 294 F. 845, 850 (2d Cir.1923) (citing *Shubert Theatrical Co.* and collecting New York cases) (employee writer of feature articles for the daily press provided unique services).

It has always been the rule, however, that to fall within this category of employees against whom equity will enforce a negative covenant, it is not necessary that the employee should be the only "star" of his employer, or that the business will grind to a halt if the employee leaves. *See Comstock v. Lopokowa*, 190 F. 599, 601 (C.C.S.D.N.Y.1911). Hence, as noted earlier, in determining uniqueness the inquiry now focuses more on the employee's relationship to the employer's business than on the individual person of the employee.

The "unique services" category has not often been the basis upon which a New York court has granted an injunction, and thus its full ambit there is unclear. *See American Broad. Cos.*, 52 N.Y.2d at 403 n. 6, 438 N.Y.S.2d 482, 420 N.E.2d 363. However, in *Maltby v. Harlow Meyer Savage, Inc.*, the Supreme Court in New York County found that several currency traders were unique employees because they had "unique relationships with the customers with whom they have been dealing," which were developed while they were employed and, partially at the employer's expense. *Id.* at 486, 633 N.Y.S.2d 926. The district court found the facts in *Maltby* so similar to those in the case at hand that it felt compelled in applying New York law to grant an injunction. Like *Maltby*, all of Cohen's clients came to him during his time at Ticor, and were developed, in part, at Ticor's expense. For example, about half of Cohen's clients he had attracted himself, but the other half were inherited from other departing Ticor salesmen. Cohen maintained these relationships, at least in part, by the use of the substantial entertainment expense account provided by Ticor. For instance, in 1997 Cohen spent $170,000 entertaining clients, and in the first five months of 1998 he spent about $138,000.

The trial court found Cohen's relationships with clients were "special" and qualified as unique services. It deemed these relationships unique for several reasons. First, since the costs and terms of title insurance in New York are fixed by law, competition for business relies more heavily on personal relationships. Second, since potential clients—New York law firms with real estate practices—are limited and well known throughout the industry, maintaining current clients from this established group is crucial. Third, the trial court noted that, as in *Maltby*, Cohen had negotiated his employment contract and the non-compete clause with the assistance of counsel and not from an inferior bargaining position.

*Maltby* found a trader's absence from the market for six months did not make him unemployable or affect his ability to earn a living in the industry. *Id.* Here, the non-compete period is also six months, and quite plainly Cohen is not disabled from reviving his relationships with clients after the six months' absence, which would allow a new Ticor salesman sufficient opportunity to establish a fledgling relationship with Cohen's clients at Ticor.

Appellant maintains that *Maltby* can be distinguished, because in that case the employees were paid their base salary during the restricted period, while Cohen will receive nothing during his six-month hiatus. The significance of the salary paid in *Maltby* was that it helped alleviate the policy concern that non-compete provisions prevent a person from earning a livelihood. Here, by the same token, part of Cohen's $600,000 per year salary was in exchange for his promise not to compete for six months after termination, and since the employer had given Cohen sufficient funds to sustain him for six months, the public policy concern regarding impairment of earning a livelihood was assuaged. The

district court's conclusion appears correct and its issuance of an injunction based on its finding of unique services clearly does not rise to the level of an abuse of discretion.

Cohen also insists that the trial court was wrong to apply *Maltby*, which dealt with trade brokers instead of insurance salesmen, because he suggests that New York law has specifically determined that "insurance salesmen" and the relationships they develop with clients can never be "unique." But many of the cases Cohen cites are simply ones where the court refused to find—on facts that differ from the current case—that the salesperson was unique, but those same cases did not make a blanket rule that no salesperson could ever be unique. Such, of course, is not the law.

We recognize that New York decisions reveal many situations where a particular employee was found not to be "special, unique or extraordinary." *See Columbia Ribbon*, 42 N.Y.2d at 500, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (salesmen here provide standard services and are therefore not unique); *Clark Paper & Mfg. Co. v. Stenacher*, 236 N.Y. 312, 140 N.E. 708 (1923) (same); *Kaumagraph Co. v. Stampagraph Co.*, 235 N.Y. 1, 138 N.E. 485 (1923) (printers of fabric designs not unique); *Frederick Bros. Artists Corp. v. Yates*, 271 A.D. 69, 62 N.Y.S.2d 714 (1st Dep't 1946), *aff'd without opinion*, 296 N.Y. 820, 72 N.E.2d 13 (1947) (theatrical booking agent); *Corpin v. Wheatley*, 227 A.D. 212, 237 N.Y.S. 205 (4th Dep't 1929) (beauty parlor employee); *Magid v. Tannenbaum*, 164 A.D. 142, 149 N.Y.S. 445 (1st Dep't 1914) (traveling representative for tailors); *Small v. Kronstat*, 175 Misc. 626, 24 N.Y.S.2d 535 (Sup.Ct.1940) (skilled watch artisan).

■ Yet, it still remains true that where the employee's services are "special, unique or extraordinary," then injunctive relief is available to enforce a covenant not to compete, if the covenant is reasonable, and even though competition does not involve disclosure of trade secrets or confidential lists. *See Purchasing Assocs.*, 13 N.Y.2d at 273, 246 N.Y.S.2d 600, 196 N.E.2d 245. In a similar vein, we ruled in *Bradford v. New York Times Co.*, 501 F.2d 51 (2d Cir.1974), that an employee can be unique. *Bradford*, an employee of the New York Times, left the publisher where he had been serving as general manager, vice-president and director, to go to work for a competitor, Scripps–Howard Newspapers, where he took the post of assistant general manager. As part of an incentive compensation plan with his former employer he had signed a non-compete contract and upon seeking the plan's benefits was told he had breached the non-compete clause and thus had been terminated from the plan. His suit against the New York Times was dismissed by the district court. We affirmed, holding that since Bradford was a unique employee the non-compete clause was enforceable. *See id.* at 58.

■ As stated in *Service Sys. Corp. v. Harris*, 41 A.D.2d 20, 23–24, 341 N.Y.S.2d 702 (4th Dep't 1973), "[a]n employer has sufficient interest in retaining present customers to support an employee covenant where the employee's relationship with the customers is such that there is a substantial risk that the employee may be able to divert all or part of the business." In the present case this risk is clearly evidenced by the fact that in 1997 another employee, Neil Clarke, left Ticor for TitleServ and took 75 percent of his clients with him. And, this is further demonstrated by appellant's successful solicitation of a law firm to follow him to TitleServ. Moreover, one appellate court in New York affirmed the grant of an injunction in favor of an employer in a restrictive employment covenant case where the employee was held to be a "star" salesman. *Uniform Rental Div., Inc. v. Moreno*, 83 A.D.2d 629, 441 N.Y.S.2d 538 (2d Dep't 1981). Thus, we do not think our holding contravenes established law in New York.

### III   Other Issues

The other issues we earlier noted are insubstantial and require only a brief dis-

cussion. These three issues are: (1) whether Cohen possessed confidential information regarding Ticor's business; (2) whether a non-compete contract is void under New York law; (3) whether the contract between the parties could be applied to transactions involving property located outside New York State.

Having decided that the district court correctly found that Cohen had a unique relationship with Ticor and its clients, it is unnecessary for us to decide whether Cohen possessed and misused confidential information of his employer's on whose account he owed a fiduciary duty not to divulge such knowledge. We recognize that the district court issued its injunction on the additional ground of defendant's divulging Ticor's trade secrets and confidential information. Cohen insists that knowledge of pending transactions was publicly available or was common knowledge in the industry, but the trial court made a finding that the information Ticor had developed and Cohen possessed went well beyond that which could be compiled from public sources.

■ Cohen's second argument, that it was error to uphold the covenant not to compete as a bargained for contract when such contracts are void as against public policy in New York, was disposed of in our analysis under Point II. As discussed earlier, these covenants are not *per se* void and may, if fairly and reasonably drawn, be enforced by injunction.

■ Finally, it was not error to rule that the covenant covered transactions that originated in New York dealing with real property outside New York State. The Employment Contract prohibits Cohen from working on sales originating in New York, and the contract does not specify that this prohibition is limited only to those transactions where the property is located in New York. The main limitation on covenants not to compete is that they will be enforced only to the extent necessary to protect the employer's legitimate interests. *See Reed, Roberts,* 40 N.Y.2d at 307, 386 N.Y.S.2d 677, 353 N.E.2d 590. Here, approximately one-half of Cohen's business on Ticor's behalf involved sale of title insurance to New York attorneys and other New York customers in connection with real property located outside of New York. As a consequence, to protect the legitimate business interests of the employer necessarily means construing the covenant not to compete as including sales originating in New York, but which cover out-of-state property.

## CONCLUSION

For the reasons stated, therefore, the judgment entered in district court enjoining defendant under the non-competition contract is affirmed.