**AM MEDICA COMMUNICATIONS GROUP, Plaintiff,**

v.

**Suzanne KILGALLEN Defendant.**

**No. 03 Civ. 1519.**

United States District Court, S.D. New York.

April 29, 2003.

Martin E. Karlinsky, Katten Muchin Zavis Rosenman, New York City, for Plaintiff.

## *DECISION AND AMENDED ORDER*

MARRERO, District Judge.

Plaintiff AM Medica Communications Group ("AMM") filed a motion for a preliminary injunction and temporary restraining order on March 26, 2003 (the "Motion") seeking to bar defendant Suzanne Kilgallen ("Kilgallen"), a former employee of AMM, from using confidential information of AMM, providing services to clients of AMM in connection with her current employment, or providing similar products or services as are provided by AMM to any person.

Following an evidentiary hearing held before the Court on April 11, 2003 (the "Hearing"), the Court issued an Order dated April 14, 2003 denying the Motion and indicating that its findings, reasoning and conclusions would be set forth in a separate decision to be made available to the parties. Accordingly, for the reasons set forth below, the Motion is DENIED.

## I. *FACTS*

Kilgallen was hired by AMM in February of 1995, first as an assistant and later as a meetings planner, a job in which she planned medical conferences for AMM's clients. In April of 1999, Kilgallen entered into an employment contract (the "Contract") with AMM, and remained employed by AMM until December of 2002, when she voluntarily resigned in order to work for Agenda West, LLC ("Agenda"), a competitor of AMM. Kilgallen started her employment for Agenda in January of 2003.

AMM alleges that in the course of her work for Agenda, Kilgallen violated two covenants in her Contract. The first one stated:

[Kilgallen] acknowledges that the services to be rendered by [her] to AMM are of a special and unique character.

[Kilgallen] agrees that ... [she] will not ... until two (2) years from the date of termination of [her] employment with AMM other than without cause ... solicit or entice away any of the clients or customers or active prospects of AMM ..., either on [her] own account or for any other person, firm, corporation or organization, or attempt to sell, license or provide to any person the same or similar products or services as are provided by AMM ...

(Contract, attached as Exh. B to Affidavit of Katherine Dietzen in Support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction Pursuant to Fed.R.Civ.P. 65, dated March 24, 2003 ("Dietzen Aff."), at ¶ 2.1(ii).)

AMM contends that this covenant (hereinafter, the "Restrictive Covenant") forbids Kilgallen from soliciting or working with any clients of AMM for a period of two years following termination of her employment with AMM. AMM argues that Kilgallen violated the Restrictive Covenant by leaving AMM to work for Agenda and primarily handling Agenda's work for Pfizer, Inc. ("Pfizer"), a client of Agenda's which is also a client of AMM. In particular, AMM complains that Kilgallen's work for Agenda consists mainly of organizing the American Urological Association's Annual Meeting and Exhibition (the "Meeting"), which was scheduled to begin on April 26, 2003, in connection with which Pfizer is a sponsor and principal exhibitor. AMM had submitted a bid to Pfizer this year to organize the Meeting, which AMM had run for the previous two years after Agenda had run it in 2000, but AMM lost the bid to Agenda.

The second covenant that AMM accuses Kilgallen of violating states that for seven years following the termination of her employment, Kilgallen has to "treat all confidential material of AMM ... with strict confidence" and is not allowed to disclose such material to people not affiliated with AMM, remove such material from AMM's premises, or use such material in a way considered deterimental to AMM (the "Confidentiality Covenant"). (Dietzen Aff. Exh. B, at ¶ 1.) The Confidentiality Covenant defines "confidential material" as information related to AMM's business that is *not* generally available to the public. (*Id.*) AMM does not specifically allege how Kilgallen has breached the Confidentiality Covenant, other than to note that she had access to confidential information about internal pricing information and Viagra, one of Pfizer's products on which AMM worked (*Id.* at ¶¶ 18–19), and is currently running a medical conference for Pfizer that is similar to the types of conferences she ran for Pfizer while at AMM. (Diezen Aff., at ¶ 29.)

Kilgallen responds that the Restrictive Covenant is unenforceable because it is not reasonably limited in time and geographic scope, is unduly burdensome on her livelihood, and its enforcement is unnecessary to protect a legitimate interest of AMM. Furthermore, Kilgallen argues that AMM has no right to a preliminary injunction because it has failed to demonstrate that it would be irreparably harmed if she is not enjoined, and even if it did have any injuries, money damages would sufficiently compensate it. Finally, Kilgallen asserts that AMM has failed to demonstrate a likelihood of success on the merits. Barring a full dismissal by the Court, Kilgallen asks for the matter to be stayed and referred to arbitration in accordance with the Contract's arbitration clause.

## II. *LEGAL DISCUSSION*

### A. *PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER*

#### 1. *Standard of Review*

In order to prevail on a motion for a preliminary injunction and/or temporary

restraining order, a party must establish irreparable harm and either (1) a likelihood of success on the merits of the underlying claim or (2) sufficiently serious questions going to the merits of the claim and a balance of hardships tipping decidedly in the moving party's favor. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).

### 2. Irreparable Harm

The Second Circuit has noted that the irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir.1999) (per curiam) (internal quotation marks omitted). As a result, unless the party moving for a preliminary injunction can show that the alleged injury " 'is neither remote nor speculative, but actual and imminent and . . . cannot be remedied by an award of monetary damages,' a motion for a preliminary injunction should be denied." *Levinson v. Cello Music & Film Sys., Inc.*, 199 F.3d 1322, 1999 WL 980949, at *2 (2d Cir.1999) (unpublished disposition) (quoting *Rodriguez*, 175 F.3d at 234).

AMM contends that Kilgallen's work for Pfizer at her new job jeopardizes AMM's business, threatening AMM with loss of clients, diminishment of reputation in the industry and loss of future business. AMM asserts that these potential damages cannot be successfully redressed through monetary means because it is not possible to redress the loss of a relationship with a client. AMM also alleges that Kigallen's purported misuse of AMM's confidential material threatens AMM with incalculable harm.

■ Based on a review of the documents submitted by both parties, the Court is not persuaded that AMM has sufficiently demonstrated that Kilgallen's work for Agenda in any way threatens AMM's business, reputation or client base. Kilgallen left AMM after Pfizer had chosen Agenda to produce the Meeting, which eliminates the possibility that she directly provided support to Agenda while working for it to help Agenda win the bid. In addition, AMM has submitted no evidence or even alleged that Kilgallen provided any materials or support to Agenda during her employment with AMM, so it is unclear how Kilgallen could be held responsible for Pfizer's selection of Agenda to manage the Meeting.[1] Moreover, Agenda had already run the Meeting in years past—indeed, AMM lost the Meeting to Agenda once before in 2000 after running the Meeting in 1997 and 1998. Thus, Pfizer had already demonstrated its willingness to hire Agenda and its lack of loyalty to the two companies when it came to hiring an agency to manage the Meeting, and AMM has shown that its business can survive and rebound after losing a bid to run the Meeting.

AMM's reliance on *Ticor Title Insurance Co. v. Cohen*, 173 F.3d 63 (2d Cir. 1999), to bolster its contention that it will suffer irreparable harm from Kilgallen's move to Agenda only weakens AMM's allegations. *Ticor* concerned a former vice president of a title insurance company,

---

1. AMM implies that the Court should infer nefarious intent from the fact that Kilgallen resigned the day after Agenda won the bid for the Meeting. However, an equally plausible explanation is that Kilgallen was waiting to have the bid resolved before leaving AMM to ensure that no one thought she had anything to do with Agenda's successful bid. Neither party presented any evidence to support either theory at the Hearing, and consequently the Court disregards the issue. *See Federal Leasing Inc. v. Underwriters at Lloyd's, et al.*, 487 F.Supp. 1248, 1252 (D.Md.1980) ("a court may resolve conflicting inferences of fact in ruling on a motion for a preliminary injunction filed under Rule 65").

earning an annual salary of one million dollars, who left his employer for a direct competitor and solicited his old employer's clients to move with him to his new job before he even resigned his old employment. *See id.* at 66–68. Here, Kilgallen is a modestly paid meetings planner who has not been shown to have made any efforts to solicit any clients from AMM to Agenda. Indeed, AMM itself downplays Kilgallen's role at the company by noting that she "at all times remained under the direction and supervision of [AMM] senior management." (Dietzen Aff., at ¶ 16.)

In addition, the executive employee in *Ticor* had been extensively involved in negotiating his employment contract, and his lawyer had actually drafted the form of the non-compete provision which he later protested was unenforceable. *Id.* at 66–67. Here, Kilgallen signed a pre-printed form contract, and there is no indication that she was able to negotiate any of its terms, nor would one expect a company to engage in lengthy negotiations over the contract of a contract employee providing the type of services rendered by Kilgallen. Thus, it is misleading for AMM to claim that Kilgallen "freely bargained for" the Contract, (see Plaintiff's Memorandum in Support of Its Application for a Temporary Restraining Order and a Preliminary Injunction Pursuant to Fed.R.Civ.P. 65, at 14–15), and then cite a New York Supreme Court case to support such a contention when that case involved a partner in an insurance agency whose employment contract had been signed "after extensive negotiations in which [the partner] was represented by counsel." *Chernoff Diamond & Co. v. Fitzmaurice, Inc., et al.,* 234 A.D.2d 200, 651 N.Y.S.2d 504, 505 (1st Dep't 1996).

■ AMM also is unable to demonstrate how Kilgallen's use of any confidential material of AMM could lead to irreparable harm. AMM contends that Kilgallen re-ceived confidential information about the marketing, prescriber lists and budgets of Viagra. (Dietzen Aff., at ¶ 18.) Yet, such information belongs to Pfizer, not to AMM, and is most likely shared by Pfizer with any agency running its conferences. Moreover, a Pfizer official asserted that many of the materials and information utilized by agencies like AMM and Agenda are shared among Pfizer personnel and agencies as a "best practice," (see Affidavit of Barbara Quinn, dated April 3, 2003 ("Quinn Aff."), at ¶ 6), making it difficult to consider these items confidential. Finally, AMM contends that Kilgallen had access to pricing information for clients, and personal relationships with personnel at potential conference sites. Considering that Agenda has been successfully involved in the bidding process with Pfizer before, and has managed the Meeting previously, it is hard to be persuaded that Kilgallen's possible knowledge in these areas will in any way significantly harm AMM or help Agenda.

### 3. *Success on the Merits*

■ Along with AMM's inability to show irreparable harm, it is unlikely to succeed on the merits of the underlying claim of breach of contract. The Second Circuit "disfavor[s] restrictive covenants in the employment context," enforcing them "only to the extent they are reasonable and necessary to protect valid business interests." *Lucente v. Int'l Bus. Mach. Corp.,* 310 F.3d 243, 254 (2d Cir.2002). Thus, New York courts have enforced restrictive covenants only "to the extent that [the covenant] is reasonable in time and area, necessary to protect the employer's legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee." *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220, 1223 (1999). Assuming the covenant is reason-

able in time and scope, the Second Circuit has only upheld such a covenant if it is necessary "(i) to prevent an employee's solicitation or disclosure of trade secrets, (ii) to prevent an employee's release of confidential information regarding the employer's customers, or (iii) in those cases where the employee's services to the employer are deemed special or unique." *Ticor*, 173 F.3d at 70.

As discussed above, AMM has not sufficiently demonstrated how Kilgallen's work for Agenda in any way jeopardizes AMM's business interests or that she is privy to any relevant confidential information. This lack of evidence is particularly relevant when considering the adverse effect the enforcement of the Restrictive Covenant would have on Kilgallen's employment prospects. According to her new employer, Pfizer comprises ninety percent of Agenda's business, and if Kilgallen was unable to work with Pfizer, she would be in significant danger of losing her job. (See Affidavit of Constance Baker, dated April 3, 2003, at ¶ 18.) Moreover, a representative of Pfizer notes that Pfizer utilizes a number of agencies like AMM to organize and manage events for different Pfizer products, (see Quinn Aff., at ¶ 4), and Kilgallen claims that Pfizer utilizes more than forty such agencies, (see Affidavit of Suzanne Killagen, dated April 3, 2003, at ¶ 22), which would further limit the number of possible employers for whom she could work. In addition, the Restrictive Covenant prohibits Kilgallen from "attempt[ing] to sell, license or provide to *any person* the same or similar products or services as are provided by AMM...." (Dietzen Aff., at ¶ 2.1(ii) (emphasis added).) Thus, one could reasonably conclude that if AMM were to enforce the Restrictive Covenant—which has no limit to its geographic reach—to its fullest extent, Kilgallen could be prohibited from working anywhere in the world with any agency in the

only industry she has known during her professional career. Such a prohibition would be particularly unfair given that the Restrictive Covenant was part of a boilerplate form employment contract that she had to sign in order to continue her employment at AMM.

At the Hearing, AMM interpreted this language as referring only to Kilgallen's dealings with AMM. This reading does not flow from the plain language of the Contract and would effectively require the Court to write into the Contract a provision that was not there when the Contract was drafted. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Deloach*, 708 F.Supp. 1371, 1385 (S.D.N.Y.1989) (refusing to write a missing provision into the agreements before the court); *Henderson v. Yorway Contracting Services*, 113 Wash. App. 1056, 2002 WL 31269808, at *5 (2002) (unpublished opinion) ("[I]t is not the function of the courts to write into a contract provisions that the parties did not include."). AMM suggested at the Hearing that if the Court found the Contract's covenants too restrictive, it could exercise its equitable powers to "blue pencil" the applicable provisions to make them shorter and hence enforceable. *See EarthWeb, Inc. v. Schlack*, 71 F.Supp.2d 299, 313 (S.D.N.Y. 1999) (describing such powers). However, the Court declines to exercise such discretion because the Contract as a whole overreaches. *Id.*

Such overreaching can be seen again when studying the time restraint in the Restrictive Covenant, which is unreasonable to Kilgallen, requiring her to adhere to the previously discussed restrictions for two years. Kigallen does not have a substantial client base and has not been shown to possess any significant trade secrets or confidential information. *See Ticor*, 173 F.3d at 71–72 (finding six-month non-compete reasonable to allow company "suffi-

cient opportunity to establish a fledgling relationship with [departing employee's] clients"); *DoubleClick Inc. v. Henderson,* No. 97 Civ. 116914, 1997 WL 731413, at *5 (N.Y.Sup.Ct.1997) (enforcing six-month non-compete against two employees who attempted to leave and start their own company and who had access to highly sensitive information regarding the company, including its revenue projections, plans for future projects, pricing and product strategies, and databases containing information about clients). As a result, the Court has no basis to prevent Kilgallen from practicing in her chosen field for two years.

In addition, contrary to AMM's contention, Kilgallen's services can hardly be categorized as "special and unique." Such characteristics have traditionally been associated with "various categories of employment where the services are dependent on an employee's special talents; such categories include musicians, professional athletes, actors and the like." *Ticor,* 173 F.3d at 70; *accord Bradford v. New York Times Co.,* 501 F.2d 51 (2d Cir.1974) (second-highest ranking executive of the newspaper in charge of all business operations and reporting directly to the publisher). However, employees who do not fit such categories can qualify if the employer establishes that the employee's "services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury." *Am. Inst. of Chem. Eng'rs v. Reber–Friel Co.,* 682 F.2d 382, 390 n. 9 (2d Cir.1982) (citations omitted); *see also EarthWeb,* 71 F.Supp.2d at 313–14. AMM has not shown that the nature of Kilgallen's services meet these articulated standards or that she cultivated the type of special client relationships that the Second Circuit found worthy of protection in *Ticor. See id.* at 314.

### B. *DISMISSAL OF CLAIM*

In addition to opposing the preliminary injunction and temporary restraining order, Kilgallen moves to dismiss AMM's claim in its entirety. As discussed above, the unenforceability and unreasonableness of the Restrictive Covenant and AMM's failure to prove that Kilgallen has violated the Confidentiality Covenant weigh in favor of dismissing the complaint for failure to state a claim.

### III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the Court's Order herein dated April 14, 2003 is amended to incorporate the discussion set forth above; and it is further

**ORDERED** that AMM's motion for a preliminary injunction seeking to enjoin Kilgallen from using confidential information of AMM and providing services to clients of AMM in connection with her current employment is denied; and it is further

**ORDERED** that the underlying complaint filed by AMM on March 5, 2003 charging Kilgallen with breach of contract and fiduciary duty is dismissed.

The Clerk of Court is directed to close this case.

**SO ORDERED.**