OPINION OF THE COURT
Charles Edward Ramos, J.
This dispute arises out of the alleged breach of a restrictive covenant contained in an employment agreement. Plaintiff Kanan, Corbin, Schupak & Aronow (KCSA) seeks by way of an order to show cause- a preliminary injunction pursuant to CPLR 6301, enforcing noncompetition and nonsolicitation covenants against defendants Evan Smith and Erica Pettit.
Background
Plaintiff KCSA is a New York-based investor public relations firm. Defendants Evan Smith and Erica Pettit are former employees of KCSA, currently employed by defendant Financial Dynamics (FD), a competing financial public and investor relations firm. KCSA alleges that Smith and Pettit are soliciting and inducing KCSA clients to terminate their agreements with KCSA and retain FD to perform those services, in breach of noncompete covenants contained in defendants’ respective employment agreements.
KCSA instituted this action alleging claims against Smith, Pettit and FD for (1) breach of Smith’s employment agreement, (2) injunctive relief to enforce the restrictive covenants in Smith’s employment agreement, (3) breach of Pettit’s employment agreement, (4) injunctive relief to enforce the restrictive covenants in Pettit’s employment agreement, (5) tortious interference by FD International with Smith and Pettit’s employment agreements and service contracts between KCSA and its clients, (6) tortious interference by both Smith and Pet-tit with the KCSA service contracts, and (7) misappropriation of trade secrets by all defendants.
KCSA and FD facilitate capital market communications between publicly traded companies, financial professionals, the media and the investing public. In accord with industry standard, both firms engage their clients as exclusive service provid *414 ers on a monthly or yearly retainer basis. Both firms rely on maintaining close, personal relationships between clients and. the professional staff who manage their accounts, nurturing an intimate understanding and familiarity with the intricacies of the client’s business and financial condition.
Defendant Evan Smith was hired by KCSA as a manager in March 2001. Prior to joining KCSA, Smith was an experienced and successful investor relations professional with his own client base. Smith brought two major clients with him to KCSA from his previous employ, PRN and Media 100 (collectively the Smith accounts). The terms of his employment were set out in an agreement Smith executed (Smith agreement) shortly before he commenced employment at KCSA in 2001. The Smith agreement contained a covenant restricting his conduct in relation to KCSA clients in the event of his employment’s termination. The termination section provided that Smith could take with him and continue to service the Smith accounts, but could not perform any services directly or indirectly competitive with services rendered by KCSA for any client retained by KCSA during Smith’s employment for a period of 12 months following termination. The Smith agreement further provided for liquidated damages and payment of legal fees in the event of a breach of the agreement.
In 2003, Smith was promoted to managing partner of KCSA. By this time, Smith was managing approximately 13 accounts for KCSA generating approximately $100,000 in fees per month.
KCSA hired defendant Erica Pettit in 2001 to work as an assistant to several investor relations professionals, including Smith. Upon hire, Pettit executed a similar letter agreement (the Pettit agreement), which prohibited Pettit from performing any services either directly or indirectly competitive with services rendered by KCSA for any client retained during the term of her employment for a period of 12 months following termination. Additionally, the Pettit agreement contained an identical liquidated damages provision as that contained in the Smith agreement, then concluded by stating that any breach of the agreement constitutes irreparable injury, entitling KCSA to injunctive relief.
In June 2004, dissatisfied with working conditions at KCSA, Smith began seeking alternate employment and interviewed with ED representatives. In early November 2004, Smith began to discuss specific terms of possible employment with ED, at which time Smith provided John Quinn, chief financial officer *415 of FD, a copy of the Smith agreement. Upon reviewing the document, Quinn prepared a statement to FD counsel (the Quinn memo), describing Smith’s intentions to move to FD and to solicit or induce KCSA clients to follow him. Additionally, the Quinn memo seeks counsel’s advice concerning the legality of the described conduct in light of the noncompete covenants of the Smith agreement. According to Quinn’s affidavit, Quinn’s secretary then inadvertently faxed this memo to Jeffrey Corbin, a KCSA partner. Shortly thereafter, Quinn alerted Corbin that a fax was sent containing privileged attorney-client communication, and requested its immediate return. KCSA terminated Smith’s employment that afternoon.
Shortly thereafter, KCSA made several overtures to Pettit, offering her promotion to vice-president and attempting to induce her to sign a new and more restrictive employment agreement. Pettit told KCSA that she wished to review the proposed offer with her attorney. Pettit then attempted to download client information onto two portable disks, e-mailed to herself a client contact list, and left for the day. According to Pettit’s affidavit, it was her common practice to take client information with her when she was planning to take an extended trip or over a weekend so that she could readily access such information at the clients’ request. Pettit swears in her affidavit that despite her attempts, the download was unsuccessful. Further, she swears that she has surrendered the two disks-on-key to her attorneys, and that neither she nor Smith are in possession of any information belonging to KCSA. Pettit allowed her offer of promotion to lapse and KCSA terminated her employment on November 15, 2004. Both Smith and Pettit commenced employment at FD on this same day.
Discussion
A party seeking preliminary injunctive relief pursuant to CPLR 6301 must show: “(1) a likelihood of success on the merits, (2) irreparable injury if provisional relief is not granted and (3) that the equities are in his favor.” (Preston Corp. v Fabrication Enters., 68 NY2d 397, 406 [1986].) Because the purpose of a preliminary injunction is to prevent litigants from taking actions that they are otherwise legally entitled to take in advance of adjudication on the merits, they should be issued cautiously and in accordance with appropriate procedural safeguards. (Uniformed Firefighters Assn. of Greater N.Y. v City of New York, 79 NY2d 236 [1992].)
*416 A. Likelihood of Success on the Merits
With few exceptions, New York courts are generally reluctant to enforce restrictive covenants contained in employment agreements due to public policy considerations which militate against sanctioning the loss of a person’s livelihood. (Purchasing Assoc. v Weitz, 13 NY2d 267, 271 [1963].) Accordingly, a restrictive covenant contained in an otherwise valid employment agreement will be enforceable only if it “(1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public.” (BDO Seidman v Hirshberg, 93 NY2d 382, 388-389 [1999].)
1. The Reed Standard.
In Reed, Roberts Assoc. v Strauman (40 NY2d 303 [1976]), the Court of Appeals ruled on the enforceability of a three-year noncompetition agreement signed by the former vice-president of a business consultancy. Adopting the Restatement of Agency standard, the Reed court stated that a restrictive covenant would only be specifically enforced in such context if it was “reasonable in time and area, necessary to protect the employer’s legitimate interests, not harmful to the general public and not unreasonably burdensome to the employee.” (40 NY2d at 307 [citations omitted].)
The Reed court set forth a two-part test for determining whether a restrictive covenant serves the employer’s legitimate interest within the context of the Restatement of Agency standard. Under the legitimate interest inquiry, the Reed court held that restrictive covenants will be enforceable only (1) “to the extent necessary to prevent the disclosure or use of trade secrets or confidential information,” or (2) “where an employee’s services are unique or extraordinary.” (Id. at 308.)
Under the first prong of its test, the Reed court determined that the vice-president’s alleged use of the consultancy’s “customer-list” was not actionable because the names and contact information of current and potential customers were easily ascertainable from public sources. (Id.) Further, the Court held that the defendant’s intimate knowledge of plaintiffs business operation did not meet the “unique or extraordinary” standard. Rather, the Court stated that where knowledge is not deemed a protectable trade secret and there has been no misappropriation, an employee should not be inhibited from realizing his professional potential. (Id. at 309; see also Purchasing Assoc. v Weitz, 13 NY2d 267, 274 [1963] [stating that an employee’s services are to be deemed “unique or extraordinary” in this *417 context only where it “appear(s) that his services are of such character as to make his replacement impossible or that the loss of such services would cause the employer irreparable injury”].)
In Investor Access Corp. v Doremus & Co. (186 AD2d 401 [1st Dept 1992], lv denied 81 NY2d 706 [1993]), the First Department applied the Reed “legitimate interest” test to a noncom-petition agreement used by a financial investor and public relations firm. Investor Access involved a defendant executive who signed an employment agreement upon hire, restricting him from soliciting or servicing any current or former client of the firm for a period of 12 months after termination. Upon the executive’s commencement of work at a competing firm, a major account followed him, and his former employer sought specific enforcement of the employment agreement. The Court refused to grant specific enforcement because the restrictive covenant did not protect a legitimate interest of the employer firm because the executive did not provide “unique or extraordinary” services to his employer, and had not misappropriated any trade secrets or confidential information. Further, the Court held that the executive’s recollection of information pertaining to particular clients is not confidential, and the client’s decision to follow the defendant to his new employment was based on the defendant’s familiarity of the client’s needs and outstanding ability in the field. (Id. at 404.)
2. The BDO Seidman Standard.
Since the First Department’s ruling in Investor Access, the Court of Appeals modified the Reed standard in BDO Seidman v Hirshberg (93 NY2d 382 [1999]). The Seidman court held that an employer may legitimately seek to protect, in certain circumstances, the “good will” which an employee develops with the employer’s client in the course of employment. In applying the Reed standard, the Court determined that the employee did not gain a competitive advantage by using confidential information. (Id. at 391.) The Court nevertheless recognized a “legitimate interest” held by the employer in seeking to protect its client relationships and goodwill. (Id., citing Harlan M. Blake, Employee Agreements Not to Compete, 73 Harv L Rev 625, 647.)
Upon this premise, the Court of Appeals held that therefore the employer has a legitimate and protectable interest in preventing former employees from exploiting the client’s goodwill which was created and maintained at the employer’s expense and effort. (Id.) The Court thus ruled that the agreement not to compete could be enforced to the limited extent *418 that it protected the client relationships which the former employee had developed with the employer’s clients during the tenure of his employment.
The Seidman court also provided for the severability and partial enforcement of noncompete covenants to the extent that they protect an employer’s “legitimate interests,” rather than refusing to enforce overly broad restrictive covenants in their entirety. (Id. at 394-395.) Accordingly, the Court of Appeals enforced the agreement not to compete, but limited it to the extent that it reached clients which were not his. (Id., citing in support of severance generally, Restatement [Second] of Contracts § 184; Karpinski v Ingrasci, 28 NY2d 45 [1971].) This standard also excluded, therefore, clients whom the manager serviced during the tenure of his employment but with whom the manager had established a prior relationship at a previous employment.
Applying the above analysis to the present case, it is evident the restrictive covenants contained in the Smith and Pettit agreements fail to meet the “legitimate interest” prong insofar as the Reed two-part test is concerned. Irrespective of Pettit’s alleged piracy of confidential KCSA information during the download attempt, Smith and Pettit’s recollection of the identity of their clients and of the details of their accounts does not amount to misappropriation within the context of Reed’s first prong. Further, neither Smith nor Pettit’s professional services could be termed either “unique” or “extraordinary.” Neither employee’s skills were “of such character as to make replacement impossible” (Purchasing Assoc., 13 NY2d at 274), and although investor relations might in some circles be considered a “learned profession,” the defendant in Investor Access who held essentially the same position as Smith was deemed by the First Department to not possess unique or extraordinary skills within the meaning of Reed’s second prong. The restrictive covenants contained in the Smith and Pettit agreements really seek to protect the “good will” of the clients developed during the tenure of Smith’s and Pettit’s employment with KCSA.
The Seidman court held that the restrictive covenant in that case was valid, in part, because it had not been imposed as a condition of employment. The Seidman court, however, re-: mained unclear as to whether all such covenants thus imposed *419 are facially invalid.* While the First Department has not yet ruled on this issue, the Fourth Department in Scott, Stackrow & Co., C.EA.'s, P.C. v Skavina (9 AD3d 805 [3d Dept 2004]) provides some guidance. The Skavina case dealt with an appeal from a denial of preliminary injunction on the ground that a noncompete covenant was overbroad and therefore unenforceable. The plaintiff employer sought partial enforcement of the overbroad covenant under Seidman. The Fourth Department refused partial enforcement based upon its examination of the circumstances surrounding the restrictive covenant’s imposition. The Skavina court interpreted Seidman as requiring an affirmative showing by the employer of “an absence of anticompetitive misconduct” in order for partial enforcement to be sustained in accordance with the Seidman “good will” standard.
Like the covenant in Skavina, KCSA required Smith and Pet-tit to sign the agreements containing the restrictive covenants as a condition of initial employment. Furthermore, like the former employer in Skavina, KCSA has failed to demonstrate, “or even argue[ ],” an “absence of anticompetitive misconduct” (at 807) in the circumstances surrounding the imposition of the Smith and Pettit agreements. The Skavina ruling thus militates against enforcement of the restrictive covenants contained in the Smith and Pettit agreements.
Additionally, FD maintains that the client relationships which Smith enjoyed while employed by KCSA were thoroughly and entirely of his own making and therefore do not represent a “legitimate interest” of KCSA. While the Seidman standard tends to favor protection of client goodwill created at the employer’s “expense,” whether client goodwill developed as a result of the defendants’ own independent efforts, rather than being generated and maintained primarily at the employer’s expense is a triable issue of fact. (Milbrandt & Co., Inc. v Griffin, 5 Misc 3d 1011[A], 2005 NY Slip Op 51333[U] [Sup Ct, Westchester County 2004].) Although existence of an issue of fact alone will not defeat a motion for preliminary injunction (see generally CPLR 6312 [c]), KCSA has nevertheless failed to meet its burden on this issue. As the party seeking injunctive relief, a minimal showing is required in support of the proposition that *420 the goodwill allegedly misappropriated was created at KCSA’s expense. KCSA’s motion papers only minimally advance this argument.
Finally, the Seidman standard arose out of a motion for summary judgment, and therefore has limited applicability in an injunctive context. The case in Seidman involved a reimbursement clause, providing that “if” the manager’s employment were terminated “then” he would owe liquidated damages in the event of competitive conduct which was a restrictive covenant “in its purpose and effect” only. (93 NY2d at 388.) Specific enforcement in the context of the Seidman case was payment of liquidated damages and did not involve the considerations a court must make when contemplating the “drastic” remedy of preliminary injunction.
Analysis under the two-part Reed test, involving “trade secrets” and “unique or extraordinary services,” incorporates, to an extent, the irreparable harm prong of the standard preliminary injunction analysis. Disclosure of truly confidential information, or competition by a truly “irreplaceable” employee, both constitute harm satisfying the “irreparable” standard required by the preliminary injunction statute. It has even been indicated that one of the Reed prongs constitutes a “legitimate interest” only to the extent that it satisfies the “irreparable harm” standard. (See e.g. Purchasing Assoc., 13 NY2d at 274 [holding that services are “unique or extraordinary” only if their loss would cause employer “irreparable injury”].) Because it remains unclear whether the Seidman “good will” analysis is meant to be exhaustive of the irreparable harm inquiry, or whether further analysis is required on the issue, a secondary inquiry is thus necessary to enforce a restrictive covenant in conformity with the EDO Seidman standard.
B. Irreparable Harm
The only case where the Seidman goodwill standard was used as the basis for granting an injunction is Johnson Controls, Inc. v A.P.T. Critical Sys., Inc. (323 F Supp 2d 525 [SD NY 2004]; but see Healthworld Corp. v Gottlieb, 12 AD3d 278 [1st Dept 2004] [modifying an existing injunction to accord with Seidman holding]). In Johnson, plaintiff purchased a company, hiring many of the company’s former employees, including defendants. As a condition of employment, defendants executed employment agreements containing noncompetition provisions. Defendants later resigned, formed a directly competing company, and began using a substantially similar name to plaintiffs company. The *421 Johnson court conducted an inquiry into whether the loss of client relationships constituted irreparable harm in circumstances where owners of plaintiff employers’ business sued former employees who set up a directly competing business. In granting the injunction, the court reasoned that calculation of money damages to effectively redress the loss of client relationships for an indeterminate amount of business for years to come would be difficult and, thus, the loss of goodwill in this context satisfied the irreparable harm requirement. (Id. at 532, quoting Ticor Tit. Ins. Co. v Cohen, 173 F3d 63, 69-70 [2d Cir 1999].)
New York state courts have been similarly ruling, granting injunctions to enforce restrictive covenants against former owners turned employees of plaintiff employers’ new business. (See e.g. Hay Group v Nadel, 170 AD2d 398 [1st Dept 1991]; Misys Intl. Banking Sys., Inc. v TwoFour Sys., LLC, 6 Misc 3d 1004[A], 2004 NY Slip Op 51721[U] [Sup Ct, NY County 2004].) In these cases, however, the goodwill, the protectable interest at issue, is characterized as inseparable from the identity of the sold business, and is treated more like a trademark or proprietary information. (See Hay Group, 170 AD2d 398 [1991] [discussing the value of avoiding “customer confusion”].)
Such concern does not exist in the present case. Further, it has already been established that the defendants have not misappropriated proprietary information. In contrast, the injury alleged here is easily calculable as a measure of lost fees. Smith’s restrictive covenant has a duration of 12 months, making it unnecessary to attempt quantifying an “indeterminate amount of business in years to come,” as in the Johnson case. (Johnson Controls, 323 F Supp 2d at 532 [internal quotation marks omitted].)
Moreover, NCSA’s “legitimate interest” in this case does not involve the protection of client information or knowledge of the intricacies of NCSA’s business operation within the meaning of the Investor Access standard (Investor Access, 186 AD2d at 404) because this information is within the easy recall of Smith or Pettit, does not constitute a protectable interest, and therefore its “loss” does not amount to irreparable injury. Unlike a situation involving the sale of a business, or one involving an employee’s misappropriation and disclosure of an employer’s trade secrets, the instant case threatens no harm to NCSA which may be qualified as “irreparable.” If liability is found, NCSA’s injury may be addressed by monetary compensation, as injunctive relief is unnecessary.
*422 C. Balance of the Equities
Finally, plaintiff must show that the burden caused to defendant through imposition of an injunction is less than the harm caused to plaintiff by defendant’s activities. (Edgeworth Food Corp. v Stephenson, 53 AD2d 588, 588 [1st Dept 1976].) While the court has not found irreparable harm to KCSA, the equities also do not favor granting an injunction. The parties do not dispute that clients have already left KCSA and followed Smith to FD. An injunction will not serve to retrieve these lost clients, and the court cannot compel these clients to return to KCSA. Further, as to KCSA’s current clients, an injunction will not serve to prevent them from exercising their own preference by moving elsewhere, including FD, should they decide that their business needs are better served outside of KCSA.
• In contrast, KCSA will not be prevented from continuing to service their current clients in the absence of an injunction. In conclusion, plaintiff has failed to persuade the court that it is entitled to such a drastic remedy as injunctive relief. (Edgeworth, 53 AD2d at 588.) The restrictive covenants contained in the Smith and Pettit agreements do not legitimately seek to protect (a) trade secrets or confidential information, or (b) unique or extraordinary employee services. KCSA has also failed to show an absence of anticompetitive overreaching on its part with respect to the imposition of the noncompete agreements. Further, KCSA has failed to demonstrate that it contributed meaningfully to the generation of goodwill with respect to the disputed clients. And finally, KCSA has failed to show that it would be irreparably harmed by the loss of the disputed client relationships, and that the equities balance in favor of granting an injunction. Therefore, the court declines to enforce the Smith and Pettit agreements.
Accordingly, it is ordered that the motion for an order granting a preliminary injunction is denied.

 It should be noted that neither party addresses this issue. The Seidman riding is far from clear, but it appears that the Court of Appeals intended that a court considering severance should conduct the inquiry regardless. (See Seidman, 93 NY2d at 394.)